UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK, a German banking cooperative, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:10-cv-64 |
| HAGOP N. KAZIZIAN, H.N. KAZIZIAN INSURANCE AGENCY, L.P., and MILTON CLERC, | § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff DZ Bank AG Deutsche Zentral-Genossenschaftsbank files this Original Complaint (this "Complaint") against Defendants Hagop N. Kazizian, H.N. Kazizian Insurance Agency, L.P., and Milton Clerc, and respectfully states as follows:

### I. PARTIES

1.      Plaintiff DZ Bank AG Deutsche Zentral-Genossenschaftsbank ("DZ Bank") is a bank registered under the laws of the Federal Republic of Germany that has its principal place of business in the United States located in New York.

2.      Hagop N. Kazizian ("Kazizian") is a citizen and resident of the State of Texas. He may be served with process at his residence located at 11214 Carson Avenue, Pearland, Texas 77584.

3.    H.N. Kazizian Insurance Agency, L.P. ("KIA") is a Texas limited partnership. KIA may be served with process by serving its registered agent, Hagop N. Kazizian, at his residence located at 11214 Carson Avenue, Pearland, Texas 77584.

4.    Milton Clerc ("Clerc") is a citizen and resident of the State of Texas. He may be served with process at his residence located at 3515 Sweeney Drive, Dickinson, Texas 77539.

5.    Kazizian, KIA and Clerc may be collectively referred to as the "Defendants."

## II. JURISDICTION AND VENUE

6.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a)(2) because the plaintiff is a citizen of a foreign state, the defendants are citizens of this state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a) because Kazizian and Clerc are residents of this judicial district.

## III. STATEMENT OF FACTS

8.    On or about November 30, 2007, Brooke Credit Corporation ("BCC") entered into Commercial Loan Agreement No. 6639 (the "Loan Agreement") with Kazizian and KIA in the principal amount of $530,450.00. A true and correct copy of the Loan Agreement is attached as **Exhibit A** and incorporated herein. In connection with the Loan Agreement, Kazizian and KIA also entered into that certain Addendum to Commercial Loan Agreement (the "Addendum to Loan Agreement"), a true and correct copy of which is attached as **Exhibit B** and incorporated herein.

9.     Also in furtherance of the loan transaction, on or about November 30, 2007, BCC, Kazizian and KIA entered into a promissory note (the "Note") in the principal amount of $530,450.00, with variable interest at the rate of 4.000% above the Prime Rate, as published in the Wall Street Journal. A true and correct copy of the Note is attached as **Exhibit C** and incorporated herein. The Note is secured by a Commercial Security Agreement (the "Security Agreement") whereby Kazizian and KIA pledged substantially all of their assets to secure repayment of the Note. A true and correct copy of the Security Agreement is attached as **Exhibit D** and incorporated herein.

10.     To further secure repayment of the Note, Kazizian, individually, entered into a Guaranty of the Note in favor of BCC. A true and correct copy of the Kazizian Guaranty is attached as **Exhibit E** and incorporated herein. Likewise, Clerc entered into a Guaranty of the Note in favor of BCC. A true and correct copy of the Clerc Guaranty is attached as **Exhibit F** and incorporated herein. The Guaranties provide for an "absolute, unconditional and continuing guaranty of payment" of the Note. The transaction encompassed by the Loan Agreement, the Addendum to Loan Agreement, the Note, the Security Agreement and the Guaranties shall be referred to as the "Loan."

11.     BCC assigned the Loan to Brooke Credit Funding, LLC ("BCF"), and BCF, in turn, pledged the Loan as collateral to its secured lenders, Autobahn Funding Company, LLC and DZ Bank. On October 30, 2008, BCC (n/k/a Aleritas Capital Corp.), BCF and DZ Bank entered into that certain Surrender of Collateral, Consent to Strict Foreclosure, Release and Acknowledgement of Agreement (the "Surrender of Collateral"). A true and correct copy of the Surrender of Collateral is attached as **Exhibit**

**G** and incorporated herein. Pursuant to the Surrender of Collateral, DZ Bank acquired ownership and control of the Loan and all related instruments.

12.     Kazizian and KIA used the proceeds of the Loan Agreement and Note to purchase an Allstate insurance agency. Kazizian and KIA have defaulted under the Loan Agreement and Note by, *inter alia*, ceasing business without DZ Bank's prior written consent and failing to maintain the business's good standing with the Texas Secretary of State.

13.     DZ Bank has made demand on Kazizian, KIA and Clerc for the outstanding balance due under the Note, but the Defendants have failed and refused to pay such amounts that are due and owing.

## IV. CAUSES OF ACTION

### Count One: Breach of Contract

14.     DZ Bank repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

15.     Kazizian and KIA entered into the Loan Agreement and Note which obligated them to pay DZ Bank the principal amount of $530,450.00, plus interest as set forth therein. Kazizian and Clerc are absolute guarantors of this debt.

16.     DZ Bank fully performed its contractual obligations.

17.     The Defendants have materially breached the Loan Agreement, Note and Guaranties by failing to pay the amounts due and owing to DZ Bank.

18.     The Defendants' breach caused injury to DZ Bank and has resulted in damages. DZ Bank is owed at least $260,000.00 under the relevant agreements underlying the Loan.

19.     DZ Bank seeks liquidated damages that are within the jurisdictional limits of this court.

20.     **Attorneys' Fees.** DZ Bank is entitled to recover its reasonable and necessary attorneys' fees under the relevant agreements. DZ Bank is also entitled to recover its reasonable and necessary attorneys' fees under TEX. CIV. PRAC. & REM. CODE chapter 38 because this is a suit for breach of a written contract. DZ Bank retained counsel, who presented DZ Bank's claim to the Defendants. The Defendants did not tender the amount owed within 30 days of when the claim was presented.

## V. CONDITIONS PRECEDENT

21.     All conditions precedent to DZ Bank's claims for relief have been performed or have occurred.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, DZ Bank respectfully prays that the Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in its favor, and against the Defendants, jointly and severally, for the following:

     a.     actual, compensatory, consequential, and all other damages in an amount that exceeds the minimum jurisdictional limit of this Court;

     b.     pre-judgment and post-judgment interest at the highest rate allowed by law;

     c.     attorneys' fees;

     d.     costs of court;

     e.     all such further relief to which DZ Bank is entitled at law and in equity.

DATED: February 25, 2010

Respectfully submitted,

REID DAVIS LLP

*C. Randell Carr*

C. Randall Carr
Southern District of Texas No. 589992
Texas State Bar No. 24012391
4301 Westbank Drive
Suite 230B
Austin TX 78746
(512) 647-6100
(512) 647-6129 (facsimile)
rcarr@reiddavis.com

*Attorney for Plaintiff DZ Bank*

| BORROWER NAME AND ADDRESS | LENDER NAME AND ADDRESS | LOAN DESCRIPTION |
|---|---|---|
| H.N. Kazirian Insurance Agency L.P. and Hagop N. Kazirian<br>15464 Woodforest Blvd. Suite B<br>Channelview, TX 77530 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS 66210 | Number 6839<br>Amount $ 530,450.00<br>Date 11-30-2007 |



☐ Refer to the attached Signature Addendum, incorporated herein, for additional Borrowers and their signatures.

## COMMERCIAL LOAN AGREEMENT

**LOAN STRUCTURE.** This Commercial Loan Agreement (Agreement) contemplates ☒ a single advance term Loan ☐ a multiple advance draw Loan ☐ a revolving multiple advance draw Loan. The principal balance will not exceed $ 530,450.00 _____. Borrower will pay down a revolving draw Loan's outstanding Principal to $ _____ (Pay Down Balance) _____ (Time Period). This Loan is for ☐ agricultural ☒ business purposes.

☐ Borrower may not voluntarily prepay the Loan in full at any time. ☒ Borrower may prepay the Loan under the following terms and conditions (Any partial prepayment will not excuse any later scheduled payments until the Loan is paid in full.): See Addendum to Commercial Loan Agreement

☒ **LATE CHARGES.** If a payment is made more than 10 _____ days after it is due, Borrower will pay a late charge of 5.000% of the payment amount _____

**FEES.** Borrower agrees to pay the following fees in connection with this Loan at closing or as otherwise requested by Lender: BCC Loan Fees: $15,450.00

**REQUESTS FOR ADVANCES.** Borrower authorizes Lender to honor a request for an advance from Borrower or any person authorized by Borrower. The requests for an advance must be in writing, by telephone, or any other manner agreed upon by Borrower and Lender, and must specify the requested amount and date and be accompanied with any agreements, documents, and instruments that Lender requires for the Loan. Lender will make same day advances, on any day that Lender is open for business, when the request is received before _____ (Advance Cut-off Time). Lender will disburse the advance into Borrower's demand deposit account (if any), account number _____, or in any other agreed upon manner. All advances will be made in United States dollars.

☐ These requests must be made by at least _____ (Number Required To Draw) persons, acting together, of those persons authorized to act on Borrower's behalf.
☐ Advances will be made in the amount of at least $ _____ (Minimum Amount Of Advance).
☐ Advances will be made no more frequently than _____ (Minimum Frequency Of Advance).
☐ Discretionary Advances. Lender will make all Loan advances at Lender's sole discretion.
☐ Obligatory Advances. Lender will make all Loan advances subject to this Agreement's terms and conditions.

**FINANCIAL INFORMATION.** Borrower will prepare and maintain Borrower's financial records using consistently applied generally accepted accounting principles then in effect. Borrower will provide Lender with financial information in a form acceptable to Lender and under the following terms.

A. **Frequency.** Annually, Borrower will provide to Lender Borrower's financial statements, tax returns, annual internal audit reports or those prepared by independent accountants within _____ days after the close of each fiscal year. Any annual financial statements that Borrower provides will be ☐ audited statements. ☐ reviewed statements. ☒ compiled statements.
☐ Borrower will provide Lender with interim financial reports on a _____ (Monthly, Quarterly) basis, and within _____ days after the close of this business period. Interim financial statements will be ☐ audited ☐ reviewed ☐ compiled statements.
B. **Requested Information.** Borrower will provide Lender with any other information about Borrower's operations, financial affairs and condition within _____ days after Lender's request.
☐ C. **Leverage Ratio.** Borrower will maintain at all times a ratio of total liabilities to tangible net worth, determined under consistently applied generally accepted accounting principles, of _____ (Total Liabilities to Tangible Net Worth Ratio) or less.
☐ D. **Minimum Tangible Net Worth.** Borrower will maintain at all times a total tangible net worth, determined under consistently applied generally accepted accounting principles, of $ _____ (Minimum Tangible Net Worth) or more. Tangible net worth is the amount by which total assets exceed total liabilities. For determining tangible net worth, total assets will exclude all intangible assets, including without limitation goodwill, patents, trademarks, trade names, copyrights, and franchises, and will also exclude any accounts receivable that do not provide for a repayment schedule.
☐ E. **Minimum Current Ratio.** Borrower will maintain at all times a ratio of current assets to current liabilities, determined under consistently applied generally accepted accounting principles, of _____ (Minimum Current Ratio) or more.
☐ F. **Minimum Working Capital.** Borrower will maintain at all times a working capital, determined under consistently applied generally accepted accounting principles by subtracting current liabilities from current assets, of $ _____ (Minimum Working Capital) or more. For this determination, current assets exclude _____
(Excluded Current Assets). Likewise, current liabilities include (1) all obligations payable on demand or within one year after the date on which the determination is made, and (2) final maturities and sinking fund payments required to be made within one year after the date on which the determination is made, but exclude all liabilities or obligations that Borrower may extend or extend to a date more than one year from the date of this determination.

**ATTACHMENTS.** The following documents are incorporated by reference into this Agreement: ☐ Asset Based Financing Agreement addendum dated _____ ☒ Commercial Security Agreement addendum dated 11-30-2007 ☐ Other _____

**ADDITIONAL TERMS.** See Addendum to Commercial Loan Agreement

☐ ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER) AND US (LENDER) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT. BY SIGNING THIS AGREEMENT, THE PARTIES AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT EXISTS BETWEEN THEM.

**SIGNATURES.** By signing under seal, I agree to all the terms and conditions beginning on page 1 through the bottom of page 2 of this Agreement. Borrower also acknowledges receipt of a copy of this Agreement.

**BORROWER:**
H.N. Kazirian Insurance Agency L.P. and Hagop N. Kazirian
Entity Name

| Signature Hagop N. Kazirian, President | Date 11/14/07 | Signature | Date (Seal) |
|---|---|---|---|
| Signature Hagop N. Kazirian, Individually | Date 11/14/07 | Signature | Date (Seal) |

**LENDER:**
Brooke Credit Corporation
Entity Name

| Signature Travis Zogleman, Loan Officer | Date 11-16-07 (Seal) |
|---|---|

COMMERCIAL LOAN AGREEMENT: to be used with Form COMM-NOTE
Exper1ty ©1996, 2001 Bankers Systems, Inc., St. Cloud, MN Form COMM-AGREE 7/1/2004

NOT TO BE USED FOR LOANS SUBJECT TO CONSUMER LENDING LAWS
(page 1 of 2)

EXHIBIT A

**DEFINITIONS.** In this Agreement, the following terms have the following meanings.

**Accounting Terms.** Accounting terms that are not specifically defined will have their customary meanings under consistently applied generally accepted accounting principles.

**Loan.** Loan refers to all advances made under the terms of this Agreement.

**Loan Documents.** Loan Documents include this Agreement and all documents prepared pursuant to the terms of this Agreement including all present and future promissory notes (Notes), security instruments, guaranties, and supporting documentation as modified, amended or supplemented.

**Property.** Property is any collateral, real, personal or intangible, that secures Borrower's performance of the obligations of this Agreement.

**ADVANCES.** To the extent permitted by law, Borrower will indemnify Lender and hold Lender harmless for reliance on any request for advance that Lender reasonably believes to be genuine. Lender's records are conclusive evidence as to the number and amount of advances and the Loan's unpaid principal and interest. If any advance results in an overadvance (when the total amount of the Loan exceeds the principal balance) Borrower will pay the overadvance, as requested by Lender. Regarding Borrower's demand deposit account(s) with Lender, Lender may, at its option, consider presentation for payment of a check or other charge exceeding available funds as a request for an advance under this Agreement. Any such payment by Lender will constitute an advance on the Loan.

**CONDITIONS.** Borrower will satisfy all of the following conditions before Lender makes any advances under this Agreement. If this Agreement provides for discretionary advances, satisfaction of these conditions does not commit Lender to making advances.

**No Default.** There has not been a default under the Loan Documents nor would a default result from making the advance.

**Information.** Borrower has provided all required documents, information, certifications and warranties, all properly executed on forms acceptable to Lender.

**Inspections.** Borrower has accommodated, to Lender's satisfaction, all inspections.

**Conditions and Covenants.** Borrower has performed and complied with all conditions required for an advance and all covenants in the Loan Documents.

**Warranties and Representations.** The warranties and representations contained in this Agreement are true and correct as the time of making the advance.

**Financial Statements.** Borrower's most recently delivered financial statements and reports are current, complete, true and accurate in all material respects and fairly represent Borrower's financial condition.

**Bankruptcy Proceedings.** No proceeding under the United States Bankruptcy Code has been commenced by or against Borrower or any of Borrower's affiliates.

**WARRANTIES AND REPRESENTATIONS.** Borrower makes these warranties and representations which will continue as long as this Agreement is in effect.

**Power.** Borrower is duly organized, validly existing and in good standing in all jurisdictions in which Borrower operates. Borrower has the power and authority to enter into this transaction and to carry on its business or activity as it is now being conducted. All persons who are required by applicable law and the governing documents of Borrower have executed and delivered to Lender this Agreement and other Loan Documents.

**Authority.** The execution, delivery and performance of this Agreement and the obligation evidenced by the Loan Documents are within Borrower's duly authorized powers, has received all necessary governmental approval, will not violate any provision of law or order of court or governmental agency, and will not violate any agreement to which Borrower is a party or to which Borrower or Borrower's property is subject.

**Name and Place of Business.** Other than previously disclosed in writing to Lender, Borrower has not changed its name or principal place of business within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Borrower will not use any other name and will preserve Borrower's existing name, trade names and franchises.

**No Other Liens.** Borrower owns or leases all property that is required for its business and except as disclosed, the property is free and clear of all liens, security interests, encumbrances and other adverse interests.

**Compliance With Laws.** Borrower is not violating any laws, regulations, rules, orders, judgments or decrees applicable to Borrower or its property, except as disclosed to Lender.

**Financial Statements.** Borrower represents and warrants that all financial statements Borrower provides fairly represent Borrower's financial condition for the stated periods, are current, complete, true and accurate in all material respects, include all direct or contingent liabilities, and that there has been no material adverse change in Borrower's financial condition, operations or business since the date the financial information was prepared.

**COVENANTS.** Until the Loan and all related debts, liabilities and obligations under the Loan Documents are paid and discharged, Borrower will comply with the following terms, unless Lender waives compliance in writing.

**Inspection and Disclosure.** Borrower will allow Lender or its agents to enter any of Borrower's premises during mutually agreed upon times, to do the following: (1) inspect, audit, review and obtain copies from Borrower's books, records, orders, receipts, and other business related data; (2) discuss Borrower's finances and business with anyone who claims to be Borrower's creditor; (3) inspect Borrower's Property, audit for the use and disposition of the Property's proceeds; or do whatever Lender decides is necessary to preserve and protect the Property and Lender's interest in the Property. As long as this Agreement is in effect, Borrower will direct all of Borrower's accountants and auditors to permit Lender to examine and make copies of Borrower's records in their possession, and to disclose to Lender any other information that they know about Borrower's financial condition and business operations. Lender may provide Lender's regulator with required information about Borrower's financial condition, operation and business or that of Borrower's parent, subsidiaries or affiliates.

**Business Requirements.** Borrower will preserve and maintain its present existence and good standing in jurisdictions where Borrower is organized and operates. Borrower will continue its business or activities as presently conducted, by obtaining licenses, permits and bonds where needed. Borrower will obtain Lender's prior written consent before ceasing business or engaging in any line of business that is materially different from its present business.

**Compliance with Laws.** Borrower will not violate any laws, regulations, rules, orders, judgments or decrees applicable to Borrower or Borrower's property, except for those which Borrower challenges in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its appeal should Borrower lose. On request, Borrower will provide Lender with written evidence that Borrower has fully and timely paid taxes, assessments and other governmental charges levied or imposed on Borrower and its income, profits and property. Borrower will adequately provide for the payment of taxes, assessments and other charges that have accrued but are not yet due and payable.

**New Organizations.** Borrower will obtain Lender's written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all of the assets of another; or materially changing legal structure, management, ownership or financial condition.

**Other Liabilities.** Borrower will not incur, assume or permit any debt evidenced by notes, bonds or similar obligations except debt in existence on the date of this Agreement and fully disclosed to Lender; debt subordinated in payment to Lender on terms acceptable to Lender; accounts payable incurred in the ordinary course of business and paid under customary trade terms or contested in good faith with reserves satisfactory to Lender; or as otherwise agreed to by Lender.

**Notice.** Borrower will promptly notify Lender of any material change in financial condition, a default under the Loan Documents, or a default under any agreement with a third party which materially and adversely affects Borrower's property, operations or financial condition.

**Dispose of No Assets.** Without Lender's prior written consent, Borrower will not sell, lease, assign, or otherwise distribute all or substantially all of its assets.

**Insurance.** Borrower will obtain and maintain insurance with insurers in amounts and coverages that are acceptable to Lender and customary with industry practice. This may include without limitation credit insurance, insurance policies for public liability, fire, hazard and extended risk, workers compensation, and, in Lender's request, business interruption and/or rent loss insurance. Borrower may obtain insurance from anyone Borrower wants that is acceptable to Lender. Borrower's choice of insurance provider will not affect the credit decision or interest rate. At Lender's request, Borrower will deliver to Lender certified copies of all of these insurance policies, binders or certificates. Borrower will obtain and maintain a mortgagee or loss payee endorsement for Lender when these endorsements are available. Borrower will require all insurance policies to provide at least 10 days prior written notice to Lender of cancellation or modification. Borrower consents to Lender using or disclosing information relative to any contract of insurance required for the Loan for the purpose of replacing this insurance. Borrower also authorizes its insurer and Lender to exchange all relevant information related to any contract of insurance required by any Loan Documents.

**Property Maintenance.** Borrower will keep property that is security of useful in its business in good working condition by making all needed repairs, replacements and improvements and by making payments due on the property.

**DEFAULT.** If the Loan is payable on demand, Lender may demand payment at any time whether or not any of the following events have occurred. Borrower will be in default if any one or more of the following occur. (1) Borrower fails to make a payment in full when due. (2) Borrower makes an assignment for the benefit of creditors or becomes insolvent, either because Borrower's liabilities exceed its assets or Borrower is unable to pay debts as they become due; or Borrower petitions for protection under any bankruptcy, insolvency or debtor relief laws, or is the subject of such a petition or action and fails to have the petition or action dismissed within a reasonable period of time. (3) Borrower fails to perform any condition or to keep any promise or covenant on this Agreement or any debt or agreement Borrower has with Lender. (4) A default occurs under the terms of any instrument evidencing or pertaining to this Agreement. (5) If Borrower is a producer of crops, Borrower fails to plant, cultivate and harvest crops in due season. (6) Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained by federal law. (7) Anything else happens that either significantly impairs the value of the Property or, unless controlled by the New Jersey Banking Law, causes Lender to reasonably believe that Lender will have difficulty collecting the Loan.

**REMEDIES.** After Borrower defaults, and after Lender gives any legally required notice and opportunity to cure, Lender may at its option use any and all remedies Lender has under state or federal law or in any of the Loan Documents, including, but not limited to, terminating any commitment or obligation to make additional advances or making all or any part of the amount owing immediately due. Lender may set-off any amount due and payable under the terms of the Loan against Borrower's right to receive money from Lender, unless prohibited by applicable law. Except as otherwise required by law, by choosing any one or more of these remedies Lender does not give up Lender's right to use any other remedy. Lender does not waive a default if Lender chooses not to use a remedy, and may later use any remedies if the default continues or occurs again.

**COLLECTION EXPENSES AND ATTORNEYS' FEES.** To the extent permitted by law, Borrower agrees to pay all expenses of collection, enforcement and protection of Lender's rights and remedies under this Agreement. Expenses include, but are not limited to, reasonable attorneys' fees including attorney fees as permitted by the United States Bankruptcy Code, court costs and other legal expenses. These expenses will bear interest from the date of payment until paid in full at the contract interest rate then in effect for the Loan. All Attorneys' fees will be 10 percent of the principal sum due or a larger amount as the court judges as reasonable and just. ALL Attorneys' fees will be 15 percent of the principal and interest owing.

**GENERAL PROVISIONS.** This Agreement is governed by the laws of the jurisdiction where Lender is located, the United States of America and to the extent required, by the laws of the jurisdiction where the Property is located.

**Joint and Individual Liability and Successors.** Each Borrower, individually, has the duty of fully performing the obligations on the Loan. Lender can sue all or any of the Borrowers upon breach of performance. The duties and benefits of this Loan will bind and benefit the successors and assigns of Borrower and Lender.

**Amendment, Integration and Severability.** The Loan Documents may not be amended or modified by oral agreement. Borrower agrees that any party signing this Agreement as Borrower is authorized to modify the terms of the Loan Documents. Borrower agrees that Lender may inform any party who guarantees this Loan of any Loan accommodations, renewals, extensions, modifications, substitutions, or future advances. The Loan Documents are the complete and final expression of the understanding between Borrower and Lender. If any provision of the Loan Documents is unenforceable, then the unenforceable provision will be severed and the remaining provisions will be enforceable.

**Waivers and Consent.** Borrower, to the extent permitted by law, consents to certain actions Lender may take, and generally waives defenses that may be available based on these actions or based on the status of a party to the Loan. Lender may renew or extend payments on the Loan. Lender may release any borrower, endorser, guarantor, surety, or any other co-signer. Lender may release, substitute, or impair any Property securing the Loan. Lender's course of dealing, or Lender's forbearance from, or delay in, the exercise of any of Lender's rights, remedies, privileges, or right to insist upon Borrower's strict performance of any provision contained in the Loan Documents, will not be construed as a waiver by Lender, unless the waiver is in writing and signed by Lender. Lender may participate or syndicate the Loan and share any information that Lender decides is necessary about Borrower and the Loan with the other participants.

**Interpretation.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement. Unless otherwise indicated, the terms of this Agreement shall be construed in accordance with the Uniform Commercial Code.

**Notice.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in this Agreement, or to any other address designated in writing. Notice to one party will be deemed to be notice to all parties. Time is of the essence.

Exṕẽrẽ® ©1998 Bankers Systems, Inc., St. Cloud, MN Form COMM-AGREE 7/17/2004



# ADDENDUM TO COMMERCIAL LOAN AGREEMENT

This Addendum is made to and a part of the Commercial Loan Agreement (the "Agreement"), by and between **H.N. Kazizian Insurance Agency L.P.** and **Hagop N. Kazizian** (collectively "Borrower") and Brooke Credit Corporation ("Lender").

Now for good and valuable consideration the receipt and sufficiency of which are acknowledged, it is agreed as follows:

1.  LOAN PROCEEDS.  Borrower warrants, represents and agrees that the proceeds of the Loan shall be used solely for the following specific purposes:  to purchase agency assets including without limitation a "Book of Business".

2.  NOTICE OF SALE OF BOOK OF BUSINESS.  Borrower shall not sell, transfer or otherwise convey any of the Collateral, including without limitation its "Book of Business" or other agency assets without Lender's prior written consent.  In the event that Borrower wishes to sell all or any portion of the Collateral, Borrower's Book of Business (as such terms are hereinafter defined) and other agency assets, Borrower shall provide to Lender thirty (30) days advance written notice of said sale with a copy of the proposed sale contract with a written request for Lender's approval of such transaction.  Lender may approve or disapprove such transaction at its discretion.  "Book of Business" shall be defined hereunder as Borrower's interest in and under Borrower's R3001C Agreement (or R3001, R3001A, R3001S, as applicable, and in any case referred to hereinafter as "R3001C" in the Loan Documents) with Allstate Insurance Company, the policies in Borrower's account under that agreement, the right to new and renewal commissions for said policies, and Borrower's customer list and policy information for said customers.

3.  R3001C AGREEMENT/ALLSTATE INSURANCE COMPANY.  Borrower represents, warrants and agrees that Borrower will not terminate (or give/provide cause for Allstate to terminate) its R3001C Agreement with Allstate Insurance Company.  Borrower hereby represents and warrants to Lender that, as of the date of this Agreement:  Borrower is in full compliance with the R3001C Agreement with Allstate Insurance Company; Borrower is not in default under the R3001C Agreement; and, there are no defaults or unmatured events of default or events which with the passage of time will become defaults under the R3001C Agreement.  Borrower further represents and warrants to Lender that Borrower: shall maintain full compliance with said R3001C Agreement; shall not cause or allow any default or event of default thereunder; shall maintain said R3001C Agreement in full force and effect until all liabilities of Borrower to Lender are paid in full; and, shall not permit any condition to exist or engage in, or permit to exist or occur, any condition or event or transaction in connection with said R3001C Agreement which might constitute grounds for Allstate Insurance Company to terminate said Agreement.

4.  CSRP REPORTS; COMMISSION INFORMATION; ETC.  From the date of this Agreement and thereafter until all liabilities of Borrower to Lender are paid in full, Borrower agrees that unless Lender shall otherwise expressly consent in writing, it will, within fifteen (15) days after the receipt thereof by Borrower from the Insurance Company(s) (as that term is hereinafter defined) but in no event less than every six months, furnish to Lender a copy of Borrower's Customer Satisfaction/Retention/Profitability Report ("CSRP Report") from the Insurance Company(s) containing a listing, description and verification of all insurance policies produced by Borrower and all commissions paid and to be paid by the Insurance Company(s) to Borrower with a certificate of Borrower's President or Chief Financial Officer (if Borrower is not a sole proprietorship), dated the date of such CSRP Report verifying, warranting and attesting to Lender the accuracy and veracity of such CSRP Report.  In addition to a CSRP report, Lender may at its discretion ask for production reports, third party company commission statements, or other commission report or similar information, records or data indicating the Borrower's current or past commission volume or revenues; such information, reports or statements shall be provided by Borrower to Lender within 10 business days of Lender's request.

5.  ASSIGNMENT OF COMMISSIONS.

    (a)  In addition to the rights Borrower grants Lender in the Collateral (as defined below), Borrower grants, conveys and assigns to Lender or Lender's designee all Borrower's right, title and interest in and to Borrower's commissions.  Borrower shall defend the rights of Lender in and to the Commissions against all claims and

© 2007 Brooke Credit Corporation all rights reserved



EXHIBIT B

demands of all persons or entities at any time claiming the same or any interest therein adverse to Lender and shall keep the commissions free from liens, assignments, and other security interest except for the assignment of interest granted pursuant to the Loan Documents.

(b)     Borrower may collect, receive, enjoy and use the commissions solely to the extent such commissions are in excess of the amounts due Lender pursuant to the Loan Documents so long as Borrower is not in default under the terms of any of the Loan Documents. Borrower agrees to execute an Assignment of Commission Notice, Commission Payment Agreement, Agent/Agency's Deduction and Payment Authorization Form, Lender's Acceptance and Authorization Form, and such other forms reasonably required by Lender to effect the assignment of Borrower's commissions to Lender or its designee (collectively for this section 5, the "Commission Assignment Forms") in a form acceptable to Lender and Allstate Insurance Company, if Allstate's approval is required.

(c)     Borrower agrees to execute new Commission Assignment Forms (in a form acceptable to Lender and Allstate Insurance Company, if Allstate's approval is required) upon Lender's request in the event: (i) the amount of the payments due Lender increases or decreases; (ii) the Commission Assignment Forms expire, terminate or are scheduled to expire or terminate; or, (iii) the Commission Assignment Forms contain an error or are in Lender's opinion otherwise deficient. Borrower shall make no attempt to terminate or modify the Commission Assignment Forms without Lender's prior written consent.

(d)     On payment in full of the obligations and all other charges owed by Borrower to Lender under the Loan Documents, Lender shall execute and deliver to Borrower a release of the Commission Assignment Forms.

6.  CONSENT TO ANNOUNCEMENTS. Borrower hereby authorizes Lender, at Lender's own expense, to place announcements or advertisements in financial newspapers, journals, marketing materials or other media containing Borrower's name and/or logo and describing the credit extended by Lender to Borrower, including without limitation the amount of the credit extended.

7.  CONSENT TO LOAN PARTICIPATIONS; ETC. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of the Loan, including without limitation: Lender's sale or transfer of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender; Lender's sale or transfer, whether now or later, of Borrower's Loan to an issuer of notes or other securities in whole or in part collateralized by Borrower's Loan; or Lender's issuance of notes or other securities which are in whole or in part collateralized by Borrower's Loan. Lender may provide, without any limitation whatsoever, to any one or more purchasers, potential purchasers or issuers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, all notices of any repurchase of such participation interests and all notices of issuance of notes or securities which are in whole or in part collateralized by Borrower's Loan. Borrower also agrees that the issuers of notes or securities and/or purchasers of any participation interests may or will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender, any issuer of notes or securities, or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such issuer or purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the issuer of such notes or securities or purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender. Borrower acknowledges that the Loan may, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Collateral. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount Loan, and containing terms, provisions and clauses no less favorable to Borrower than those contained in the original Loan Documents, and such other documents and instruments as may be required by Lender to effect the splitting of the Loan.

C 2007 Brooke Credit Corporation all rights reserved

8.   COLLATERAL.   The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.   Collateral shall include, but not be limited to:

(a)   All of Borrower's personal property, whether tangible or intangible, and all of Borrower's interest in property and fixtures, now owned or existing or hereafter acquired and wherever located, including without limitation, the following:   (i) all furniture, inventory, machinery, equipment, goods and supplies;   (ii) all commissions and rights to payment;   (iii) all instruments, documents (including, without limitation, the customer files) policies and certificates of insurance, money, chattel paper, investment property, deposits, warehouse receipts and things in action;   (iv) all general intangibles and rights to payment or proceeds of any kind, including without limitation, rights to insurance proceeds and letter of credit proceeds;   (v) all contract rights and interests of any kind, including without limitation, the rights and interests set forth in the R3001C Agreement with Allstate to the extent Borrower can assign such rights;   and (vi) the Book of Business;

(b)   Any and all telephone numbers, rights to the lease of office space, post office boxes or other mailing addresses, rights to trademarks and use of trade names, rights to software licenses, and rents received by Borrower for the lease of office space;

(c)   All deposit accounts, disbursement accounts, accounts receivable, commissions, commission receivables, economic interest of Borrower and any and all termination payments due to Borrower (as that term is defined in the Allstate R3001C Exclusive Agency Agreement executed by Borrower with Allstate Insurance Company) whether now in existence or hereafter coming into existence, all chattel paper, contract rights, instruments documents, general intangibles, inventory and goods in process of Borrower, whether now in existence or owned or hereafter coming into existence or acquired, wherever located, and all returned goods, and repossessions and replacements thereof;

(d)   Commissions payable to Borrower and any assignment thereof;

(e)   A Security Interest and Collateral Assignment of Termination Payments and Economic Interest;

(f)   Any and all life insurance proceeds and cash value and any Assignment of Life Insurance; and,

(g)   any and all additions, attachments, parts, repairs, accessories, accessions, replacements and substitutions to or for any of the forgoing and any proceeds and products of the above property.

9.   DEFAULT.   In addition to the other events that may give rise to a default under the Agreement, Borrower will be in default if one or more of the following occur.

(a)   Borrower fails to fulfill or perform any term, condition or obligation set forth in any agreement heretofore (or any covenant thereof), now and/or from time to time hereafter executed between Borrower and Lender (or its designee) and/or executed by Borrower for the benefit of Lender, including but not limited to the Commercial Loan Agreement and Addendum, Commercial Promissory Note, Commercial Security Agreement and Addendum, UCC Financing Statement and Attachment, Authorization to Release Information, Disbursement Authorization, Borrower's Affidavit Regarding Financial Status and Other Material Facts, Corporate Resolution Authorization, Assignment of Commission Notice, Commission Payment Agreement, Agent/Agency's Deduction and Payment Authorization Form, Lender's Acceptance and Authorization Form (collectively, each a "Loan Document"), including without limitations Borrower's failure to make payments when due in accordance with the terms of the Note; or, if any representation or warranty set forth in any Loan Document is not as represented or warranted by Borrower.

© 2007 Brooke Credit Corporation all rights reserved

(b) Borrower's failure to fulfill, perform or enforce any term, condition or obligation set forth in any agreement by Borrower (or any covenant thereof) to purchase agency assets that are related to or the subject of the Loan Documents;

(c) the R3001C Agreement with Allstate is terminated by Borrower or Allstate for any reason;

(d) the total annual sales commissions of Borrower for the most recent calendar year (or the immediately preceding twelve month period if selected by Lender) decrease to ____N/A____ percent or less of the principal balance of the Note;

(e) an individual Borrower's insolvency, death or legal incapacitation; a guarantor's insolvency, death or legal incapacitation; or, the insolvency, death or legal incapacitation of a principal, officer or owner of Borrower;

(f) if at any time the total of all outstanding obligations of Borrower (and/or any guarantor of Borrower's obligations, at Lender's sole discretion) to Lender and/or any other Person exceeds _____N/A_____ (Note: Lender may select market value net worth requirement or in other manner limit increases in Borrower's or a Guarantor's debt load; no such limitations indicated by "N/A");

(g) if, without Lender's prior written consent, ____N/A____'s ownership interest in ____N/A____ is transferred, diluted or further encumbered in any manner, including but not limited to, the issuance of new shares, assignment or gift of shares, the substitution of shares, the hypothecation or pledge of shares (Note: Applies at Lender's discretion, if Borrower is a corporation, or if individual Borrower pledges shares of a corporation as collateral; inapplicability indicated by "N/A");

(h) if, without Lender's prior written consent, ____N/A____ distributes in any successive 12 month period by cash, assets, salary, consulting fees, dividends, loans, payment in kind, or other such distribution directly or indirectly to Borrower; Borrower's owners, partners, principals, directors, officers, spouse; or guarantors, any amount in excess of the greater of (i) or (ii): (i)____N/A____ ; or (ii) annual earnings of ____N/A____ before interest, taxes, depreciation and amortization, less any applicable debt payments of ____N/A____ (Note: At Lender's discretion; inapplicability indicated by "N/A") ;

(i) if, Borrower does not pay obligations associated with the agency assets or the operation of Borrower's agency in a timely manner and Lender, in its sole discretion, determines Borrower's delinquency will materially impair Lender's security interest;

(j) Borrower's failure to perform the obligations and duties of any contract relating to Borrower's business; and/or

(k) Borrower fails to maintain errors and omissions coverage acceptable to Lender.

A default by Borrower in performing under the terms of one Loan Document shall constitute a default under the terms of all other Loan Documents.

10. REMEDIES UPON AND EFFECT OF DEFAULT. In addition to any remedy or right Lender has under any Loan Document, the Uniform Commercial Code or other law, and in addition to any effect of default set forth in any other Loan Document, the Uniform Commercial Code or other law, in the event Borrower fails to cure any monetary default within five (5) calendar days or any non monetary default within fifteen (15) calendar days, Lender at its discretion may enforce the following:

(a) For a period of three (3) years after Borrower's default and failure to cure, Borrower shall not directly or indirectly solicit or write insurance policies for any of Borrower's customers and shall not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Borrower's successor to the agency assets or operations. Borrower agrees that this prohibition is reasonable and necessary and that the credit extended to Borrower is ample consideration for this restriction. Borrower understands that Borrower is

v: 2007 Brooke Credit Corporation all rights reserved

not prohibited from working for any other company or in any particular line of work, but that this covenant not to solicit or divert only restricts the Borrower from writing insurance for or contacting in person, by telephone, by mail, or by any other means, those customers or potential customers he/she worked with while an agent operating the agency or agency assets comprising part of the Collateral.

(b) Borrower shall enforce, for the continued benefit of Lender, all non solicitation agreements or non compete agreements currently in force between Borrower and its owners, officers, directors, partners, independent contractors and employees.

Borrower shall be allowed to cure any non monetary default upon written notice from Lender and within the time period stated above in this paragraph 10 unless: (i) such non monetary default has existed for a period of (6) months or more; and/or (ii) Lender reasonably believes that such non monetary default is incurable (Borrower would not be able to cure the non monetary default during the applicable cure period).

11. AGREEMENT WITH EMPLOYEES, INDEPENDENT CONTRACTORS, OWNERS, DIRECTORS, OFFICERS AND PRODUCERS (a) Without Lender's prior written consent, Borrower shall not enter into any employment, producer or other agreement which purports to vest or transfer ownership of agency assets. Unless otherwise agreed by Lender in writing, Borrower further agrees that all owners, directors, officers, as well as all employees, independent contractors, producers or other such persons having insurance or other financial services licenses or authority, shall enter into written agreements with Borrower containing an acknowledgment of Lender's priority position in agency assets, and containing a covenant that such person, for a period of at least two (2) years following termination of such agreement, will not directly or indirectly solicit or write insurance policies for any of Borrower's customers and will not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Borrower, its successors, assigns or designees. Borrower agrees that it shall enforce such provisions for its benefit and for the benefit of Lender. Borrower agrees to provide to Lender upon Lender's written request: copies of employment, producer or other such agreements pertaining to Borrower's business or operations; and, any employees', independent contractors', owners', directors', officers' and producers' acknowledgment of Lender's priority position in the agency assets and other property which are the subject of the Loan Documents or which secure the loan.

12. AGREEMENT TO PURCHASE AGENCY ASSETS Borrower shall not amend or waive any material term of any agreement to purchase agency assets and/or confidentiality and non-competition agreement ancillary thereto without the prior written consent of Lender. Further, Borrower shall enforce all material terms of such agreement, including but not limited to any agreement or covenant not to solicit or compete, for its benefit and for the benefit of Lender. Borrower represents and warrants that it has provided a true and accurate copy of the agreement to purchase agency assets and ancillary agreements which are related to or the subject of the Loan Documents. Borrower also warrants that such purchase agreement or ancillary agreement contains a covenant that the seller, for a period of at least three (3) years following closing of such agreement, will not directly or indirectly solicit or write Policies for any of Borrower's customers and will not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Borrower, its successors, assigns or designees.

13. PROTECTION OF COLLATERAL. If Lender confirms that sales commissions have materially declined when compared with the sales commissions from prior months or years and Lender believes that such decline indicates a material negative sales commissions trend, Lender may require Borrower to enter into an agreement with a consultant approved by Lender pursuant to which Borrower agrees to conduct specified marketing activities each month and/or enter into an agreement pursuant to which a consultant approved by Lender analyzes Borrower's agency operations. Furthermore, in the event that a key employee of Borrower's business operations dies, becomes disabled, abandons the business operation or experiences other such extenuating circumstances, Lender may require Borrower to retain a consultant approved by Lender to assist in the management and operation of Borrower's agency until qualified replacement management can be retained or the agency can be sold to another person or entity. Borrower acknowledges that if any such agreement is required, neither Lender nor Lender's approved consultant guarantees the efficacy of such arrangement in preserving or increasing the value of the agency assets. Furthermore, any rights exercised by Lender pursuant to this paragraph shall not be construed as a waiver by Lender of any other rights or remedies it may have pursuant to this Agreement or any other Loan Document.

© 2007 Brooke Credit Corporation all rights reserved

14. PREPAYMENT PREMIUM. Any promissory note(s) executed by Borrower shall provide for a prepayment premium equal to three and one half percent (3.5%) of the outstanding principal loan balance as of the date Borrower prepays. This prepayment premium shall apply for the first sixty months of the life of the loan.

15. CUMULATIVE INTERPRETATION. Provisions in the Loan Documents are intended to be cumulative. To the extent that the provisions of this Agreement conflict with those of any other Loan Document, the provision which provides Lender most protection and grants Lender the greatest rights shall control. Likewise, if the provisions of any Loan Document conflict with those of any other Loan Document, the provision which provides Lender most protection and grants Lender the greatest rights shall control.

16. GOVERNING LAW. Notwithstanding any other provision of this Agreement or any other Loan Document, the Agreement and all Loan Documents shall be construed and governed by the laws of the State of Kansas except to the extent that the perfection of the interests in the Agency Assets is governed by the laws of a jurisdiction other than the State of Kansas. Subject to the arbitration provision set forth below, at the option of Lender, jurisdiction and venue for any dispute arising under or in relation to this Agreement will lie only in Kansas or a U.S. District Court having jurisdiction over Kansas. In the event that an arbitration action, lawsuit, administrative proceeding or litigation is brought with respect to this Agreement, the prevailing party shall be entitled to be reimbursed for, and/or have judgment entered with respect to, all of its costs and expenses, including reasonable attorney's fees' and legal expenses.

17. COLLATERAL PRESERVATION AGREEMENT. Borrower acknowledges that Lender may enter into or has entered into an agreement one or more persons or entities to assist Lender in the preservation of the Collateral. Borrower acknowledges that such person or entity may be affiliated with Lender and that Lender may pay such person or entity a fee for his/her/its assistance.

18. ARBITRATION   At the option of Lender, any issue, claim, dispute or controversy that may arise out of, in connection with or relating to the Loan Documents or their breach, and which the parties are not able to resolve themselves, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in a court having jurisdiction thereof. The parties agree to use arbitration to resolve any such issue, claim, dispute or controversy prior to and in lieu of filing any lawsuits, complaints, charges or claims.

19. CONFIDENTIALITY  Borrower agrees that the contents of this Agreement are proprietary and that Borrower will keep the terms and conditions of this Agreement and the negotiations and discussions leading up to this Agreement confidential except to the extent the Borrower needs to divulge such information to their accountants, attorneys, or other professionals as long as such professionals are required to maintain confidentiality.

Unless specifically amended hereby, all provisions, terms and conditions shall remain as set forth in the Agreement and any other Loan Document.

This Addendum is effective as of this 30th day of November, 2007.

BORROWER:

By:  Hagop N. Kazizian
Title:  President

By:  Hagop N. Kazizian, Individually

LENDER:

By:  Gage Zierlein
Title:  Loan Officer

© 2007 Brooke Credit Corporation all rights reserved

## AGREEMENT NOT TO SOLICIT

The undersigned individuals agree to and are bound by the covenants set forth in paragraph 10(a) herein and specifically acknowledge that the covenants contained in said paragraph are reasonable and necessary and that the undersigned has received ample consideration for same.

_____
Hagop N. Kazizian, Individually

_____
Milton Rene Clerc, Individually

_____
Charles Clifton Culbertson, Individually

RAQUEL RODRIGUEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-21-09

© 2007 Branke Credit Corporation all rights reserved

| | | |
|---|---|---|
| H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian<br>15464 Woodforest Blvd. Suite B<br>Channelview, TX 77530 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS 66210 | Loan Number 8639<br>Date 11-30-2007<br>Maturity Date 12-24-2019<br>Loan Amount $530,450.00<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of  five hundred thirty thousand four hundred fifty
and no/100 _____ Dollars $ 530,450.00 _____

☒ **Single Advance:** I will receive all of this principal sum on 11-30-2007 _____. No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
Conditions: The conditions for future advances are _____
_____

☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to
all other conditions and expires on _____.

☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 11-30-2007 _____ at the rate of _____ 11.500 % per
year until 12-01-2007 _____

☒ **Variable Rate:** This rate may then change as stated below.

  ☒ **Index Rate:** The future rate will be  4.000 percent above  the following index rate: Prime Rate, as published in The Wall Street Journal
  _____

  ☐ **Ceiling Rate:** The interest rate ceiling for this note is the _____ ceiling rate announced by the Credit Commissioner from time to time.

  ☒ **Frequency and Timing:** The rate on this note may change as often as every day beginning 12-01-2007 _____.
    A change in the interest rate will take effect On the following day _____.

  ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
    _____ %. The rate may not change more than _____ % each _____.

  **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
  ☒ The amount of each scheduled payment will change.     ☐ The amount of the final payment will change.
  ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a Actual/365 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
  ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
  ☐ at a rate equal to _____

☒ **LATE CHARGE:** If a payment is made more than 10 _____ days after it is due, I agree to pay a late charge of 5.000% of the payment amount _____

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not  included in the principal amount
  above: _____

**PAYMENTS:** I agree to pay this note as follows:
144 monthly payments of $6,861.05 beginning 01-24-2008. This is a variable rate loan and the payment amounts may change.

**ADDITIONAL TERMS:**
1) See Addendum to Commercial Loan Agreement dated November 30, 2007.
2) The term "following day" referred to in "Frequency and Timing" above refers to the next business day following a change in the Prime Rate as reported in the Wall Street Journal.
3) A change in the interest rate will have the effect of changing the amount of the final payment; however, at Lender's discretion upon notice to Borrower, the amount of each scheduled monthly payment may change.

┌─────────────────────────────────────────┐
│ THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL │
│ AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE │
│ CONTRADICTED BY EVIDENCE OF PRIOR, │
│ CONTEMPORANEOUS, OR SUBSEQUENT ORAL │
│ AGREEMENTS OF THE PARTIES. │
│ │
│ THERE ARE NO UNWRITTEN ORAL │
│ AGREEMENTS BETWEEN THE PARTIES. │
└─────────────────────────────────────────┘

Signature for Lender

_____
Gaga Zhadan, Loan Officer

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date):

Security Agreement dated November 30, 2007.

(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is Purchase Allstate Insurance Agency
Assets _____

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2). I have received a copy on today's date.**

H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian

_____
Hagop N. Kazizian, President

_____
Hagop N. Kazizian, Individually

UNIVERSAL NOTE
Exxxxx  ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN-TX  3/7/2002   '07.20

(page 1 of 2)

EXHIBIT C

**DEFINITIONS:** As used on page 1, "☑" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Texas will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default on this loan and any agreement securing this loan if any one or more of the following occurs:
(1) I fail to perform any obligation which I have undertaken in this note or any agreement securing this note;
(2) you, in good faith, believe that the prospect of payment or the prospect of my performance of any other of my obligations under this note or any agreement securing this note is impaired; or
(3) I fail to pay, or keep any promise, on any debt or agreement I have with you unless otherwise prohibited by law.

If any of us are in default on this note or any security agreement, you may exercise your remedies against any or all of us.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of my debt under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest);
(3) give notice that amounts due have not been paid (notice of dishonor);
(4) give notice of intent to accelerate; or
(5) give notice of acceleration.

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign any obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

Experts ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN-TX  2/7/2002

| H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian<br>15464 Woodforest Blvd. Suite B<br>Channelview, TX 77530 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS 66210 | Loan Number 6039<br>Date 11-30-2007<br>Mat. Date 12-24-2018<br>Loan Amount $ 530,450.00<br>Renewal Of ___ |
|---|---|---|
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

## DISBURSEMENT AUTHORIZATION

I hereby authorize and request the following disbursement from the loan referenced above:

| | | | | |
|---|---|---|---|---|
| a. Amount given to me directly | $ 0.00 | o. | | $ |
| b. Amount paid on my account (# ___ ) | $ | p. | | $ |
| c. To Lender | $ | q. | | $ |
| Amounts paid to others on my behalf: | | r. | | $ |
| d. Insurance Companies | $ | s. | | $ |
| e. Public Officials | $ | t. | | $ |
| f. Loan Fees - BCC SL #4425 | $ 15,450.00 | u. | | $ |
| g. Purchase Allstate Agency | $ 515,000.00 | v. | | $ |
| h. ___ | $ | w. | | $ |
| i. ___ | $ | x. | | $ |
| j. ___ | $ | y. | | $ |
| k. ___ | $ | z. | | $ |
| l. ___ | $ | aa. | | $ |
| m. ___ | $ | bb. | | $ |
| n. ___ | $ | cc. | | $ |

Comments:

H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian

X ___ Hagop N. Kazizian, President

X ___

X ___

Loan Officer: Gene Zieglein

X ___ Hagop N. Kazizian, Individually

X ___

X ___

ExpereS  © 1995 Bankers Systems, Inc., St. Cloud, MN  Form DA  5/30/2000

(page 1 of 1)

| DEBTOR NAME AND ADDRESS | SECURED PARTY NAME AND ADDRESS |
|---|---|
| H.N. Kazizian Insurance Agency L.P. and Hagop N. K... | Brooke Credit Corporation |
| 15464 Woodforest Blvd. Suite B | 10950 Grandview Dr., Ste. #600 |
| Channelview, TX 77530 | Overland Park, KS 66210 |

Type: ☐ individual ☐ partnership ☐ corporation ☒ Partnership and Individual
State of organization/registration (if applicable) __TX__
☐ If checked, refer to addendum for additional Debtors and signatures.

## COMMERCIAL SECURITY AGREEMENT

The date of this Commercial Security Agreement (Agreement) is __11-30-2007__ _____.

SECURED DEBTS. This Agreement will secure all sums advanced by Secured Party under the terms of this Agreement and the payment and performance of the following described Secured Debts that (check one) ☒ Debtor ☐ _____

_____ (Obligor) owes to Secured Party:

☐ Specific Debts. The following debts and all extensions, renewals, refinancings, modifications, and replacements (describe):


☒ All Debts. All present and future debts, even if this Agreement is not referenced, the debts are also secured by other collateral, or the future debt is unrelated to or of a different type than the current debt. Nothing in this Agreement is a commitment to make future loans or advances.

SECURITY INTEREST. To secure the payment and performance of the Secured Debts, Debtor gives Secured Party a security interest in all of the Property described in this Agreement that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property. This Agreement remains in effect until terminated in writing, even if the Secured Debts are paid and Secured Party is no longer obligated to advance funds to Debtor or Obligor.

PROPERTY DESCRIPTION. The Property is described as follows:

☒ Accounts and Other Rights to Payment: All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which Debtor may have by law or agreement against any account debtor or obligor of Debtor.

☒ Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business.

☒ Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create a valid security interest in all of Debtor's equipment.

☒ Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

☒ General Intangibles: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use Debtor's name.

☒ Documents: All documents of title including, but not limited to, bills of lading, dock warrants and warehouse receipts.

☐ Farm Products and Supplies: All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in Debtor's farming operations.

☒ Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☒ Investment Property: All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☒ Deposit Accounts: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☒ Specific Property Description: The Property includes, but is not limited by, the following (if required, provide real estate description):

See Security Agreement extension


USE OF PROPERTY. The Property will be used for ☐ personal ☒ business ☐ agricultural ☐ _____ purposes.

> THIS SECURITY LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SIGNATURES. Debtor agrees to the terms on pages 1 and 2 of this Agreement and acknowledges receipt of a copy of this Agreement.

| DEBTOR | SECURED PARTY |
|---|---|
| H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian | Brooke Credit Corporation |
| Hagop N. Kazizian | Gaga Zierfein |
| President | Loan Officer |
| Hagop N. Kazizian | |
| Individually | |

Exp.... © 2000 Bankers Systems, Inc., St. Cloud, MN Form SA-BUS-TX 10/24/2003

EXHIBIT D

**GENERAL PROVISIONS.** Each Debtor's obligations under this Agreement are independent of the obligations of any other Debtor. Secured Party may sue each Debtor individually or together with any other Debtor. Secured Party may release any part of the Property and Debtor will remain obligated under this Agreement. The duties and benefits of this Agreement will bind the successors and assigns of Debtor and Secured Party. No modification of this Agreement is effective unless made in writing and signed by Debtor and Secured Party. Whenever used, the plural includes the singular and the singular includes the plural. Time is of the essence.

**APPLICABLE LAW.** This Agreement is governed by the laws of the state in which Secured Party is located. In the event of a dispute, the exclusive forum, venue, and place of jurisdiction will be the state in which Secured Party is located, unless otherwise required by law. If any provision of this Agreement is unenforceable by law, the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**NAME AND LOCATION.** Debtor's name indicated on page 1 is Debtor's exact legal name. If Debtor is an individual, Debtor's address is Debtor's principal residence. If Debtor is not an individual, Debtor's address is the location of Debtor's chief executive offices or sole place of business. If Debtor is an entity organized and registered under state law, Debtor has provided Debtor's state of registration on page 1. Debtor will provide verification of registration and location upon Secured Party's request. Debtor will provide Secured Party with at least 30 days notice prior to any change in Debtor's name, address, or state of organization or registration.

**WARRANTIES AND REPRESENTATIONS.** Debtor has the right, authority, and power to enter into this Agreement. The execution and delivery of this Agreement will not violate any agreement governing Debtor or Debtor's property, or to which Debtor is a party. Debtor makes the following warranties and representations which continue as long as this Agreement is in effect:

(1) Debtor is duly organized and validly existing in all jurisdictions in which Debtor does business;

(2) the execution and performance of the terms of this Agreement have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law or order;

(3) other than previously disclosed to Secured Party, Debtor has not changed Debtor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name; and

(4) Debtor does not and will not use any other name without Secured Party's prior written consent.

Debtor owns all of the Property, and Secured Party's claim to the Property is ahead of the claims of any other creditor, except as otherwise agreed and disclosed to Secured Party prior to any advance on the Secured Debts. The Property has not been used for any purpose that would violate any laws or subject the Property to forfeiture or seizure.

**DUTIES TOWARD PROPERTY.** Debtor will protect the Property and Secured Party's interest against any competing claim. Except as otherwise agreed, Debtor will keep the Property in Debtor's possession at the address indicated on page 1 of this Agreement. Debtor will keep the Property in good repair and use the Property only for purposes specified on page 1. Debtor will not use the Property in violation of any law and will pay all taxes and assessments levied or assessed against the Property. Secured Party has the right of reasonable access to inspect the Property, including the right to require Debtor to assemble and make the Property available to Secured Party. Debtor will immediately notify Secured Party of any loss or damage to the Property. Debtor will prepare and keep books, records, and accounts about the Property and Debtor's business, to which Debtor will allow Secured Party reasonable access.

Debtor will not sell, offer to sell, license, lease, or otherwise transfer or encumber the Property without Secured Party's prior written consent. Any disposition of the Property will violate Secured Party's rights, unless the Property is inventory sold in the ordinary course of business at fair market value. If the Property includes chattel paper or instruments, either as original collateral or as proceeds of the Property, Debtor will record Secured Party's interest on the face of the chattel paper or instruments.

If the Property includes accounts, Debtor will not settle any account for less than the full value, dispose of the accounts by assignment, or make any material change in the terms of any account without Secured Party's prior written consent. Debtor will collect all accounts in the ordinary course of business, unless otherwise required by Secured Party. Debtor will keep the proceeds of the accounts, and any goods returned to Debtor, in trust for Secured Party and will not commingle the proceeds or returned goods with any of Debtor's other property. Secured Party has the right to require Debtor to pay Secured Party the full price on any returned items. Secured Party may require account debtors to make payments under the accounts directly to Secured Party. Debtor will deliver the accounts to Secured Party at Secured Party's request. Debtor will give Secured Party all statements, reports, certificates, lists of account debtors (showing names, addresses, and amounts owing), invoices applicable to each account, and any other data pertaining to the accounts as Secured Party requests.

If the Property includes farm products, Debtor will provide Secured Party with a list of the buyers, commission merchants, and selling agents to or through whom Debtor may sell the farm products. Debtor authorizes Secured Party to notify any additional parties regarding Secured Party's interest in Debtor's farm products, unless prohibited by law. Debtor agrees to plant, cultivate, and harvest crops in due season. Debtor will be in default if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetland to produce or to make possible the production of an agricultural commodity, further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

If Debtor pledges the Property to Secured Party (delivers the Property into the possession or control of Secured Party or a designated third party), Debtor will, upon receipt, deliver any proceeds and products of the Property to Secured Party. Debtor will provide Secured Party with any notices, documents, financial statements, reports, and other information relating to the Property Debtor receives as the owner of the Property.

**PERFECTION OF SECURITY INTEREST.** Debtor authorizes Secured Party to file a financing statement covering the Property. Debtor will comply with, facilitate, and otherwise assist Secured Party in connection with obtaining possession or control over the Property for purposes of perfecting Secured Party's interest under the Uniform Commercial Code.

**INSURANCE.** Debtor agrees to keep the Property insured against the risks reasonably associated with the Property until the Property is released from this Agreement. Debtor may choose the insurance company, subject to Secured Party's approval, which will not be unreasonably withheld. Debtor will give Secured Party and the insurance provider immediate notice of any loss. Secured Party may apply the insurance proceeds toward the Secured Debts. Secured Party may require additional security as a condition of

Experts® ©2000 Bankers Systems, Inc., St. Cloud, MN Form SA-BUS-TX 10/24/2003

permitting any insurance proceeds to be used to repair or replace the Property. If Secured Party acquires the Property in damaged condition, Debtor's rights to any insurance policies and proceeds will pass to Secured Party to the extent of the Secured Debts. Debtor will immediately notify Secured Party of the cancellation or termination of insurance.

**COLLATERAL PROTECTION INSURANCE NOTICE**

As part of this Agreement, Debtor gives Secured Party a security interest in the Property described on page 1. Debtor is required to maintain insurance on the Property in an amount Secured Party specifies, subject to applicable law. Debtor agrees to purchase the insurance from an insurer authorized to do business in Texas or an eligible surplus lines insurer to the extent permitted by law. Debtor will name Secured Party as loss payee on the insurance policy. Debtor may be required to deliver a copy of the property insurance policy and proof of payment of premiums to Secured Party. If Debtor fails to meet any of these requirements, Secured Party may obtain collateral protection insurance on Debtor's behalf. Secured Party is not required to purchase any type or amount of insurance. Secured Party may obtain replacement cost insurance if authorized under applicable law, subject to policy limits. If Secured Party purchases insurance for the Property, Debtor will be responsible for the cost of that insurance, including interest and any other charges incurred by Secured Party in connection with the placement of collateral protection insurance to the extent permitted by law. Debtor understands that insurance obtained by Secured Party may cost significantly greater than the cost of insurance Debtor could have obtained. Amounts that Debtor owes are due and payable upon demand or on such other terms as Secured Party requires to the extent permitted by law.

**AUTHORITY TO PERFORM.** Debtor authorizes Secured Party to do anything Secured Party deems reasonably necessary to protect the Property and Secured Party's interest in the Property. If Debtor fails to perform any of Debtor's duties under this Agreement, Secured Party is authorized, without notice to Debtor, to perform the duties or cause them to be performed. These authorizations include, but are not limited to, permission to pay for the repair, maintenance, and preservation of the Property and take any action to realize the value of the Property. Secured Party's authority to perform for Debtor does not create an obligation to perform, and Secured Party's failure to perform will not preclude Secured Party from exercising any other rights under the law or this Agreement.

If Secured Party performs for Debtor, Secured Party will use reasonable care. Reasonable care will not include any steps necessary to preserve rights against prior parties or any duty to take action in connection with the management of the Property.

If Secured Party comes into possession of the Property, Secured Party will preserve and protect the Property to the extent required by law. Secured Party's duty of care with respect to the Property will be satisfied if Secured Party exercises reasonable care in the safekeeping of the Property or in the selection of a third party in possession of the Property.

Secured Party may enforce the obligations of an account debtor or other person obligated on the Property. Secured Party may exercise Debtor's rights with respect to the account debtor's or other person's obligations to make payment or otherwise render performance to Debtor, and enforce any security interest that secures such obligations.

**PURCHASE MONEY SECURITY INTEREST.** If the Property includes items purchased with the Secured Debts, the Property purchased with the Secured Debts will remain subject to Secured Party's security interest until the Secured Debts are paid in full. Payments on any non-purchase money loan also secured by this Agreement will not be applied to the purchase money loan. Payments on the purchase money loan will be applied first to the non-purchase money portion of the loan, if any, and then to the purchase money portion in the order in which the purchase money Property was acquired. If the purchase money Property was acquired at the same time, payments will be applied in the order Secured Party selects. No security interest will be terminated by application of this formula.

**DEFAULT.** Debtor will be in default if:

(1) Debtor (or Obligor, if not the same) fails to make a payment in full when due;

(2) Debtor fails to perform any condition or keep any covenant on this or any debt or agreement Debtor has with Secured Party;

(3) a default occurs under the terms of any instrument or agreement evidencing or pertaining to the Secured Debts;

(4) anything else happens that either causes Secured Party to reasonably believe that Secured Party will have difficulty in collecting the Secured Debts or significantly impairs the value of the Property.

**REMEDIES.** After Debtor defaults, and after Secured Party gives any legally required notice and opportunity to cure the default, Secured Party may at Secured Party's option do any one or more of the following:

(1) make all or any part of the Secured Debts immediately due and accrue interest at the highest post-maturity interest rate;

(2) require Debtor to gather the Property and make it available to Secured Party in a reasonable fashion;

(3) enter upon Debtor's premises and take possession of all or any part of Debtor's property for purposes of preserving the Property or its value and use and operate Debtor's property to protect Secured Party's interest, all without payment or compensation to Debtor;

(4) use any remedy allowed by state or federal law, or provided in any agreement evidencing or pertaining to the Secured Debts.

If Secured Party repossesses the Property or enforces the obligations of an account debtor, Secured Party may keep or dispose of the Property as provided by law. Secured Party will apply the proceeds of any collection or disposition first to Secured Party's expenses of enforcement, which includes reasonable attorneys' fees and legal expenses to the extent not prohibited by law, and then to the Secured Debts. Debtor (or Obligor, if not the same) will be liable for the deficiency, if any.

By choosing any one or more of these remedies, Secured Party does not give up the right to use any other remedy. Secured Party does not waive a default by not using a remedy.

**WAIVER.** Debtor waives all claims for damages caused by Secured Party's acts or omissions where Secured Party acts in good faith.

**NOTICE AND ADDITIONAL DOCUMENTS.** Where notice is required, Debtor agrees that 10 days prior written notice will be reasonable notice to Debtor under the Uniform Commercial Code. Notice to one party is notice to all parties. Debtor agrees to sign, deliver, and file any additional documents and certifications Secured Party considers necessary to perfect, continue, or preserve Secured Party's obligations under this Agreement and to confirm Secured Party's lien status on the Property.

| H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian<br>15464 Woodforest Blvd. Suite B<br>Channelview, TX 77530 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS 66210 | **EXTENSION OF SECURITY<br>AGREEMENT DATED:**<br>11-30-2007 |
|---|---|---|
| **DEBTOR'S NAME AND ADDRESS** | **SECURED PARTY'S NAME AND ADDRESS** | |

For value received, the Debtor hereby grants the Secured Party a security interest in the following additional collateral:

a) All of Debtor's personal property, whether tangible or intangible, and all of Debtor's interest in property and fixtures, now owned or existing or hereafter acquired and wherever located, including without limitation, the following: (i) all furniture, inventory, machinery, equipment, goods and supplies; (ii) all commissions and rights to payment; (iii) all instruments, documents (including, without limitation, the customer files) policies and certificates of insurance, money, chattel paper, investment property, deposits, warehouse receipts and things in action; (iv) all general intangibles and rights to payment or proceeds of any kind, including without limitation, rights to insurance proceeds and letter of credit proceeds; (v) all contract rights and interests of any kind, including without limitation, the rights and interests set forth in the R3001S Agreement with Allstate to the extent Debtor can assign such rights; and (vi) the Book of Business;

b) Any and all telephone numbers, rights to lease of office space, post office boxes or other mailing addresses, rights to trademarks and use of trade names, rights to software licenses, and rents received by Debtor for the lease of office space;

c) All deposit accounts, disbursement accounts, accounts receivable, commissions, commission receivables of Debtor and any and all termination payments due to Debtor (as that term is defined in the Allstate R3001S Exclusive Agency Agreement executed by Debtor with Allstate Insurance Company) whether now in existence or hereafter coming into existence, all chattel paper, contract rights, instruments, documents, general intangibles, inventory and goods in process of Debtor, whether now in existence or owned or hereafter coming into existence or acquired, wherever located, and all returned goods, and repossessions and replacements thereof;

d) Commissions payable to Debtor and assignment thereof;

e) A Security Interest and Collateral Assignment of Termination Payments and Economic Interest;

f) Any and all life insurance proceeds and cash value and any Assignment of Life Insurance; and

g) Any and all additions, attachments, parts, repairs, accessories, accessions, replacements and substitutions to or for any of the forgoing and any proceeds and products of the above property.

Debtor agrees that Lender, without liability to Debtor, may take actual possession of the Collateral without the necessity of commencing legal action and that actual possession is deemed to occur when Lender or its agent notifies Debtor of default, Debtor fails to cure such default within the time allowed hereunder, and demands that the Collateral be transferred and paid directly to Lender. Debtor agrees that, upon Debtor's default and failure to cure default within the time allowed hereunder, Lender may, without liability to Debtor, transfer any of the Collateral or evidence thereof into its own name, its designee and/or demand, collect, convert, redeem, receipt for settle, compromise, adjust, sue for, foreclose or realize upon its collateral in its own name, its designee's name or in the name of the Debtor.
*********************************************************************************Lender, without appointing a receiver, shall be entitled, but is not required, to take possession and control of the Collateral and collect the rents, issues, and profits thereof. However, Lender shall be entitled, but is not required, to have a receiver appointed by a court of competent jurisdiction to take possession and control of the Collateral and collect the rents, issues, and profits thereof. In the event a receiver is appointed, the amount so collected by the receiver shall be applied under the direction of the court to the payment of any judgment rendered or amount found due under the loan documents. However, under no circumstances whatsoever shall the appointment of the receiver be considered to create a control of Debtor's business by Lender and at all times the receiver shall be an agent apart from Lender and responsible only to the appointing court.

Debtor shall cooperate fully with Lender or a receiver and promptly endorse, set over, transfer and deliver to Lender or a receiver any Collateral in Debtor's possession or held by a third party. Debtor expressly agrees and acknowledges Lender's or a receiver's right to Collateral, right to possession of Collateral and right to operate Debtor's business without the necessity of commencing legal action and without Debtor's further action or authorization.

By signing below, Debtor acknowledges that this document describes additional collateral which is subject to all terms and conditions of the Security Agreement referred to above.

Authorized Signature(s) of Secured Party - sign below only if filing this document.

H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian

Debtor _____
Hagop N. Kazizian, President (TITLE)

Debtor _____
Hagop N. Kazizian, Individually (TITLE)

Debtor _____
(TITLE)

© 1984, 1990 BANKERS SYSTEMS, INC., ST. CLOUD, MN 56301 (1-800-397-2341) FORM SA-E 3/7/90

 **GUARANTY** 

<u>Cleveland Park</u>_____ _____ <u>Kansas</u>_____
(City)                                    (State)

<u>November 30, 2007</u>_____

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce <u>Brooke Credit Corporation</u>_____
(herein, with its participants, successors and assigns, called "Lender"), at its option, at any time or from time to time to make loans or extend other accommodations to or for the account of <u>H.N. Kasitian Insurance Agency L.P. and Hagop N. Kasitian</u>
_____
(herein called "Borrower") or to engage in any other transactions with Borrower, the Undersigned hereby absolutely and unconditionally guarantees to Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the debts, liabilities and obligations described as follows:

A. If this ☐ is checked, the Undersigned guarantees to Lender the payment and performance of the debt, liability or obligation of Borrower to Lender evidenced by or arising out of the following: _____
_____ and any extensions,
renewals or replacements thereof (hereinafter referred to as the "Indebtedness").

B. If this ☒ is checked, the Undersigned guarantees to Lender the payment and performance of each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, liabilities and obligations being hereinafter collectively referred to as the "Indebtedness"). Without limitation, this guaranty includes the following described debt(s): <u>Promissory Note #8939 dated November 30, 2007 in the amount of</u>
<u>$530,450.00</u>_____ .

The Undersigned further acknowledges and agrees with Lender that:

**1.** No act or thing need occur to establish the liability of the Undersigned hereunder, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Undersigned or modify, reduce, limit or release the liability of the Undersigned hereunder.

**2.** This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness and shall continue to be in force and be binding upon the Undersigned, whether or not all Indebtedness is paid in full, until this guaranty is revoked by written notice actually received by the Lender, and such revocation shall not be effective as to Indebtedness existing or committed for at the time of actual receipt of such notice by the Lender, or as to any renewals, extensions and refinancings thereof. If there be more than one Undersigned, such revocation shall be effective only as to the one so revoking. The death or incompetence of the Undersigned shall not revoke this guaranty, except upon actual receipt of written notice thereof by Lender and then only as to the decedent or the incompetent and only prospectively, as to future transactions, as herein set forth.

**3.** If the Undersigned shall be dissolved, shall die, or shall be or become insolvent (however defined) or revoke this guaranty, then the Lender shall have the right to declare immediately due and payable, and the Undersigned will forthwith pay to the Lender, the full amount of all Indebtedness, whether due and payable or unmatured. If the Undersigned voluntarily commences or there is commenced involuntarily against the Undersigned a case under the United States Bankruptcy Code, the full amount of all Indebtedness, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof.

**4.** The liability of the Undersigned hereunder shall be limited to a principal amount of $ <u>unlimited</u>_____
(if unlimited or if no amount is stated, the Undersigned shall be liable for all Indebtedness, without any limitation as to amount), plus accrued interest thereon and all other costs, fees, and expenses agreed to be paid under all agreements evidencing the Indebtedness and securing the payment of the Indebtedness, and all attorneys' fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned hereunder. The Lender may apply any sums received by or available to Lender on account of the Indebtedness from Borrower or any other person (except the Undersigned), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder. If the liability of the Undersigned is limited to a stated amount pursuant to this paragraph 4, any payment made by the Undersigned under this guaranty shall be effective to reduce or discharge such liability only if accompanied by a written transmittal document, received by the Lender, advising the Lender that such payment is made under this guaranty for such purpose.

**5.** The Undersigned will pay or reimburse Lender for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Lender in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.
**This guaranty includes the additional provisions on page 2, all of which are made a part hereof.**

This guaranty is ☒ unsecured; ☐ secured by a mortgage or security agreement dated _____ ;
☐ secured by _____

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.
THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, this guaranty has been duly executed by the Undersigned the day and year first above written.

X _____
Hagop N. Kasitian, Individually

_____

_____
"Undersigned" shall refer to all persons who sign this guaranty, severally and jointly.



## ADDITIONAL PROVISIONS

6. Whether or not any existing relationship between the Undersigned and Borrower has been changed or ended and whether or not this guaranty has been revoked, Lender may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the Undersigned and without any notice to the Undersigned. The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrower or any other guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Indebtedness or any evidence thereof; (ix) any order of application of any payments or credits upon Indebtedness; (x) any election by the Lender under §1111(b)(2) of the United States Bankruptcy Code.

7. The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower's obligations had not been discharged.

8. The Undersigned further agrees that the Undersigned shall be and remain obligated to pay Indebtedness even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged in bankruptcy or otherwise discharged by law. "Indebtedness" shall include post-bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not otherwise accrue to Indebtedness due to Borrower's discharge, and the Undersigned shall remain obligated to pay such amounts as though Borrower's obligations had not been discharged.

9. If any payment applied by Lender to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrower or any other obligor), the Indebtedness to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

10. Until the obligations of the Borrower to Lender have been paid in full, the Undersigned waives any claim, remedy or other right which the Undersigned may now have or hereafter acquire against Borrower or any other person obligated to pay Indebtedness arising out of the creation or performance of the Undersigned's obligation under this guaranty, including, without limitation, any right of subrogation, contribution, reimbursement, indemnification, exoneration, and any right to participate in any claim or remedy the Undersigned may have against the Borrower, collateral, or other party obligated for Borrower's debts, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

11. The Undersigned waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. Lender shall not be required first to resort for payment of the Indebtedness to Borrower or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this guaranty.

12. The liability of the Undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the Undersigned to Lender as guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

13. This guaranty shall be enforceable against each person signing this guaranty, even if only one person signs and regardless of any failure of other persons to sign this guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each of every particular and shall be fully binding upon and enforceable against either, any or all the Undersigned. This guaranty shall be effective upon delivery to Lender, without further act, condition or acceptance by Lender, shall be binding upon the Undersigned and the heirs, representatives, successors and assigns of the Undersigned and shall inure to the benefit of Lender and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this guaranty shall not affect other lawful provisions and application hereof, and to this end the provisions of this guaranty are declared to be severable. Except as authorized by the terms herein, this guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Undersigned and Lender. This guaranty shall be governed by the laws of the State in which it is executed. The Undersigned waives notice of Lender's acceptance hereof.

Exꜰꜰᴇꜰ Bankers Systems, Inc., St. Cloud, MN Form M-240-TX  9/7/2005 (For Corporate Guarantor use M-260-TX)

## GUARANTOR'S AFFIDAVIT REGARDING
## FINANCIAL STATUS AND OTHER MATERIAL FACTS

**STATE OF** Texas )

**COUNTY OF** Galveston )

COMES NOW, the undersigned, having first been duly sworn on oath, state and allege that there have been no significant changes in the financial status, including but not limited to, employer, income, available cash, etc., of **Hagop N. Kazizian** ("Guarantor"), and that the documents delivered to Brooke Credit Corporation, ("Lender") in connection therewith reflect Guarantor's current financial position.

FURTHER, the undersigned state and allege that there have been no other significant changes in Guarantor's circumstances, including but not limited to: a significant change in Guarantor's health, financial circumstances, or family status; an adverse claim, proceeding, demand or action against Guarantor; or other change in circumstance Lender may reasonably deem material to its decision to advancement loan proceeds.

FURTHER, the undersigned agree to notify Lender immediately upon any change in Guarantor's status which may result in the material impairment of Guarantor's ability to perform any or all terms of the guaranty. Such material change in status includes but is not limited to: a significant change in Guarantor's health, financial circumstances, or family status; an adverse claim, proceeding, demand or action against Guarantor; or other change in circumstance Lender may reasonably deem material. In the event of such change in Guarantor's status, Guarantor agrees to cooperate fully with Lender to protect Lender's security interest.

**FURTHER AFFIANT SAITH NAUGHT.**

AFFIANT

Hagop N. Kazizian, Individually

SUBSCRIBED AND SWORN TO before me this 14 day of November, 2007.

LINDA S YEATES
My Commission Expires
June 26, 2008

NOTARY PUBLIC

© 2007 Brooke Credit Corporation all rights reserved

## SPOUSAL WAIVER AND CONSENT AGREEMENT
## IN LIEU OF PERSONAL GUARANTY

I, **Brenda Thomas**, acknowledge that I am aware of and know the contents of the Loan Documents (as such are defined in that certain Commercial Loan Agreement and Addendum thereto by and between H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian, collectively as "Borrower" and Brooke Credit Corporation). I disclaim any and all interest in Borrower or Borrower's agency assets.

I am aware that my spouse **Hagop N. Kazizian** has signed loan documents both individually and as President of H.N. Kazizian Insurance Agency L.P. and that Brooke Credit Corporation may seek to satisfy a judgment against my spouse arising out of the enforcement of these documents by executing against property in which I may have a joint interest, including but not limited to an interest as tenants by the entirety or joint tenants with rights of survivorship (marital assets).

I hereby acknowledge, consent and agree that marital assets are subject to action on the guaranty and I will not seek to hinder operation of such action against marital assets solely because they are marital assets jointly held by me.

_Brenda Thomas_     11/4/2007
Brenda Thomas        date

© 2007 Brooke Credit Corporation all rights reserved

# GUARANTY



__Overland Park_____ __Kansas___
(City)                                      (State)

__November 30, 2007_____

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce __Brooke Credit Corporation__
(herein, with its participants, successors and assigns, called "Lender"), at its option, at any time or from time to time to make loans or extend other accommodations to or for the account of __H.N. Kaziolan Insurance Agency L.P. and Hagop N. Kazidan____

(herein called "Borrower") or to engage in any other transactions with Borrower, the Undersigned hereby absolutely and unconditionally guarantees to Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the debts, liabilities and obligations described as follows:

   A. If this ☐ is checked, the Undersigned guarantees to Lender the payment and performance of the debt, liability or obligation of Borrower to Lender evidenced by or arising out of the following: _____
_____ and any extensions,
renewals or replacements thereof (hereinafter referred to as the "Indebtedness").

   B. If this ☒ is checked, the Undersigned guarantees to Lender the payment and performance of each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, liabilities and obligations being hereinafter collectively referred to as the "Indebtedness"). Without limitation, this guaranty includes the following described debt(s): __Promissory Note #8639 dated November 30, 2007 in the amount of__
__$530,450.00_____ .

The Undersigned further acknowledges and agrees with Lender that:

   **1.** No act or thing need occur to establish the liability of the Undersigned hereunder, and no act or thing, except full payment and discharge of all Indebtedness, shall in any way exonerate the Undersigned or modify, reduce, limit or release the liability of the Undersigned hereunder.

   **2.** This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness and shall continue to be in force and be binding upon the Undersigned, whether or not all Indebtedness is paid in full, until this guaranty is revoked by written notice actually received by the Lender, and such revocation shall not be effective as to Indebtedness existing or committed for at the time of actual receipt of such notice by the Lender, or as to any renewals, extensions and refinancings thereof. If there be more than one Undersigned, such revocation shall be effective only as to the one so revoking. The death or incompetence of the Undersigned shall not revoke this guaranty, except upon actual receipt of written notice thereof by Lender and then only as to the decedent or the incompetent and only prospectively, as to future transactions, as herein set forth.

   **3.** If the Undersigned shall be dissolved, shall die, or shall be or become insolvent (however defined) or revoke this guaranty, then the Lender shall have the right to declare immediately due and payable, and the Undersigned will forthwith pay to the Lender, the full amount of all Indebtedness, whether due and payable or unmatured. If the Undersigned voluntarily commences or there is commenced involuntarily against the Undersigned a case under the United States Bankruptcy Code, the full amount of all Indebtedness, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof.

   **4.** The liability of the Undersigned hereunder shall be limited to a principal amount of $ __unlimited_____
(if unlimited or if no amount is stated, the Undersigned shall be liable for all Indebtedness, without any limitation as to amount), plus accrued interest thereon and all other costs, fees, and expenses agreed to be paid under all agreements evidencing the Indebtedness and securing the payment of the Indebtedness, and all attorneys' fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned hereunder. The Lender may apply any sums received by or available to Lender on account of the Indebtedness from Borrower or any other person (except the Undersigned), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder. If the liability of the Undersigned is limited to a stated amount pursuant to this paragraph 4, any payment made by the Undersigned under this guaranty shall be effective to reduce or discharge such liability only if accompanied by a written transmittal document, received by the Lender, advising the Lender that such payment is made under this guaranty for such purpose.

   **5.** The Undersigned will pay or reimburse Lender for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Lender in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.

**This guaranty includes the additional provisions on page 2, all of which are made a part hereof.**

   This guaranty is ☒ unsecured; ☐ secured by a mortgage or security agreement dated _____ ;
☐ secured by _____

   **THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

   **THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

   IN WITNESS WHEREOF, this guaranty has been duly executed by the Undersigned the day and year first above written.

_Milton Renè Clerc_____
~~Milton Renè Clerc, Individually~~

_____

_____

"Undersigned" shall refer to all persons who sign this guaranty, severally and jointly.



 ADDITIONAL PROVISIONS 

**6.** Whether or not any existing relationship between the Undersigned and Borrower has been changed or ended and whether or not this guaranty has been revoked, Lender may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the Undersigned and without any notice to the Undersigned. The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrower or any other guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Indebtedness or any evidence thereof; (ix) any order of application of any payments or credits upon Indebtedness; (x) any election by the Lender under §1111(b)(2) of the United States Bankruptcy Code.

**7.** The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower's obligations had not been discharged.

**8.** The Undersigned further agrees that the Undersigned shall be and remain obligated to pay Indebtedness even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged in bankruptcy or otherwise discharged by law. "Indebtedness" shall include post-bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not otherwise accrue to Indebtedness due to Borrower's discharge, and the Undersigned shall remain obligated to pay such amounts as though Borrower's obligations had not been discharged.

**9.** If any payment applied by Lender to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrower or any other obligor), the Indebtedness to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

**10.** Until the obligations of the Borrower to Lender have been paid in full, the Undersigned waives any claim, remedy or other right which the Undersigned may now have or hereafter acquire against Borrower or any other person obligated to pay Indebtedness arising out of the creation or performance of the Undersigned's obligation under this guaranty, including, without limitation, any right of subrogation, contribution, reimbursement, indemnification, exoneration, and any right to participate in any claim or remedy the Undersigned may have against the Borrower, collateral, or other party obligated for Borrower's debts, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

**11.** The Undersigned waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. Lender shall not be required first to resort for payment of the Indebtedness to Borrower or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this guaranty.

**12.** The liability of the Undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the Undersigned to Lender as guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

**13.** This guaranty shall be enforceable against each person signing this guaranty, even if only one person signs and regardless of any failure of other persons to sign this guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each of every particular and shall be fully binding upon and enforceable against either, any or all the Undersigned. This guaranty shall be effective upon delivery to Lender, without further act, condition or acceptance by Lender, shall be binding upon the Undersigned and the heirs, representatives, successors and assigns of the Undersigned and shall inure to the benefit of Lender and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this guaranty shall not affect other lawful provisions and application hereof, and to this end the provisions of this guaranty are declared to be severable. Except as authorized by the terms herein, this guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Undersigned and Lender. This guaranty shall be governed by the laws of the State in which it is executed. The Undersigned waives notice of Lender's acceptance hereof.

Ex̲p̲e̲r̲e̲s̲ ᴱ Bankers Systems, Inc., St. Cloud, MN Form M-240-TX 9/7/2005 (For Corporate Guarantor use M-250-TX)

## GUARANTOR'S AFFIDAVIT REGARDING
## FINANCIAL STATUS AND OTHER MATERIAL FACTS

**STATE OF** Texas )

**COUNTY OF** Galveston )

COMES NOW, the undersigned, having first been duly sworn on oath, state and allege that there have been no significant changes in the financial status, including but not limited to, employer, income, available cash, etc., of **Milton Rene Clerc** ("Guarantor"), and that the documents delivered to Brooke Credit Corporation, ("Lender") in connection therewith reflect Guarantor's current financial position.

FURTHER, the undersigned state and allege that there have been no other significant changes in Guarantor's circumstances, including but not limited to: a significant change in Guarantor's health, financial circumstances, or family status; an adverse claim, proceeding, demand or action against Guarantor; or other change in circumstance Lender may reasonably deem material to its decision to advancement loan proceeds.

FURTHER, the undersigned agree to notify Lender immediately upon any change in Guarantor's status which may result in the material impairment of Guarantor's ability to perform any or all terms of the guaranty. Such material change in status includes but is not limited to: a significant change in Guarantor's health, financial circumstances, or family status; an adverse claim, proceeding, demand or action against Guarantor; or other change in circumstance Lender may reasonably deem material. In the event of such change in Guarantor's status, Guarantor agrees to cooperate fully with Lender to protect Lender's security interest.

FURTHER AFFIANT SAITH NAUGHT.

AFFIANT

_Milton R. Clerc_
Milton Rene Clerc, Individually

SUBSCRIBED AND SWORN TO before me this 14 day of November, 2007.

LINDA S YEATES
My Commission Expires
June 26, 2008

_Linda S. Yeates_
NOTARY PUBLIC

© 2007 Brooke Credit Corporation all rights reserved

**AUTHORIZATION**
**TO RELEASE INFORMATION**
**regarding**
**H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian (collectively "Borrower")**

**The undersigned Guarantor(s),** understand that Borrower's loan and loan documents may be selected for review by auditors, regulators, attorneys, consultants, rating agencies, analysts, prospective purchasers of Borrower's loan, or other person or entity needing or requesting such information for legitimate purposes. This review may also be performed by the Lender, the Lender's quality control agent and/or the Lender's successors, assigns, or designees. Such a review, which may occur at any time after the closing of the loan, may include but is not limited to a re-verification of credit information and a review of Guarantor's financial information.

You are hereby authorized to release to the Lender, its agents and/or successors, assigns, and designees, or such other person or entity referenced above, any information required to allow for the conducting of such review.

A photocopy of this form may be deemed as acceptable authorization for release of any above information of documentation requested.

The original signed form is maintained by the Lender.

**GUARANTOR(S):**

_Milton René Clerc_
Milton Rene Clerc, Individually

© 2007 Brooke Credit Corporation all rights reserved

## SPOUSAL WAIVER AND CONSENT AGREEMENT
## IN LIEU OF PERSONAL GUARANTY

I, **Harriet N. Clerc**, acknowledge that I am aware of and know the contents of the Personal Guaranty signed by my spouse, **Milton Rene Clerc**, which secures the Loan Documents (as such are defined in that certain Commercial Loan Agreement and Addendum thereto by and between H.N. Kazizian Insurance Agency L.P. and Hagop N. Kazizian, collectively as Borrower, and Brooke Credit Corporation). I disclaim any and all interest in the Borrower or Borrower's agency assets.

I am aware that my spouse has signed a personal guaranty and that Brooke Credit Corporation may seek to satisfy a judgment against the Borrower arising out of the enforcement of these documents by executing against property in which I may have a joint interest, including but not limited to an interest as tenants by the entirety or joint tenants with rights of survivorship (marital assets).

I hereby acknowledge, consent and agree that marital assets are subject to action on the guaranty and I will not seek to hinder operation of such action against marital assets solely because they are marital assets jointly held by me.

Harriet N. Clerc     11/18/07

Harriet N. Clerc     date

© 2007 Brooke Credit Corporation all rights reserved

# SURRENDER OF COLLATERAL,
## CONSENT TO STRICT FORECLOSURE, RELEASE AND ACKNOWLEDGEMENT AGREEMENT

**THIS SURRENDER OF COLLATERAL, CONSENT TO STRICT FORECLOSURE, RELEASE AND ACKNOWLEDGEMENT AGREEMENT** (this *"Agreement"*) is entered into as of October 3 0 2008 among BROOKE CREDIT FUNDING, LLC, a Delaware limited liability company (the *"Debtor"*), ALERITAS CAPITAL CORP., a Delaware corporation (formerly known as Brooke Credit Corporation) (*"Aleritas"*), AUTOBAHN FUNDING COMPANY LLC, a Delaware limited liability company (the *"Lender"*), and DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK (the *"Agent"*).

## PRELIMINARY STATEMENTS

A.      Reference is made to the Amended and Restated Credit and Security Agreement dated as of August 29, 2006 among the Borrower, Aleritas, Brooke Corporation, the Lender and the Agent (as amended or otherwise modified prior to the date hereof, the *"Credit Agreement"*). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

B.      As security for the performance of the Debtor's obligations under the Credit Agreement, the Debtor granted Agent a first priority security interest in the "Collateral" under and as defined in the Credit Agreement.

C.      The Collateral includes the Loans identified on <u>Annex 1</u> attached hereto, together with all monies due thereunder, and proceeds and recoveries received with respect thereto, and the related loan agreements, promissory notes, guaranties, customer files, and the security interests in the collateral, if any, securing such loans, and the proceeds of any and all of the foregoing (collectively, the *"Specified Loans"*) .

D.      Events of Default under the Credit Agreement have occurred and are continuing, and the Agent may exercise all of its rights and remedies in connection therewith including taking possession of and liquidating the Specified Loans, all of the Debtor's rights under the Sale and Servicing Agreement and other Related Documents and the other Collateral.

E.      The Agent has demanded that the Debtor pay all moneys due and payable from the Debtor to the Agent and the Lender under the Credit Agreement.

F.      The Debtor (i) has agreed to turn over and surrender the Specified Loans, all of the Debtor's rights under the Sale and Servicing Agreement and the other Related Documents and all other Collateral (collectively, the *"Surrendered Collateral"*) and (ii) agrees that the Agent may retain the Surrendered Collateral in partial satisfaction of the Debtor's obligations under the Credit Agreement.

NOW, THEREFORE, based upon the agreed upon facts set forth above, which are incorporated herein, and the mutual promises contained herein, the parties agree as follows:

**EXHIBIT**  G

## 1. ACKNOWLEDGMENTS OF THE DEBTOR AND ALERITAS.

1.1     Each of the Debtor and Aleritas acknowledges that the Debtor is in default under the Credit Agreement and that Events of Default have occurred and are continuing, and that the Debtor is indebted to the Agent and the Lender for the current outstanding principal balance of the Advances, together with the accrued Interest and Facility Fees as of the date hereof, in aggregate amount equal to $34,956,955.86 (the *"Current Debtor Loan Indebtedness"*).

1.2     Each of the Debtor and Aleritas acknowledges that: (i) the Agent has been granted a first priority security interest in the in the Collateral, and (ii) the Agent is entitled to proceed immediately to foreclose upon the Collateral and to exercise each of the Agent's other rights and remedies set forth in the Credit Agreement as provided by the New York Uniform Commercial Code and New York law, which governs the Credit Agreement.

1.3     Each of the Debtor and Aleritas irrevocably:

1.3.1     consents to Agent's acceptance of the Surrendered Collateral in <u>partial</u> satisfaction of the obligations of the Debtor to the Agent and the Lender under the Credit Agreement as provided in Section 2.3 of this Agreement; and

1.3.2     irrevocably waives and renounces any and all rights to notice they have or may have under Section 9-601, *et seq.*, of the UCC, Part 6 of the New York Commercial Code including, without limitation, all rights under Section 9-620 to receive notice of the proposed retention of the Surrendered Collateral or subsequent disposition of same, or to the full extent of the law, any other notice or right they may have arising under or pursuant to this or any other section of the New York Uniform Commercial Code or otherwise.

1.4     Each of the Debtor and Aleritas acknowledges that none of them has any claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whether known or unknown, and whenever or howsoever arising (collectively referred to herein as *"Existing Claims"*), that can be asserted to reduce or eliminate any liability to repay any Indebtedness to the Agent or the Debtor or to seek any affirmative relief or damages of any kind or nature from the Agent or the Lender, their respective officers, representatives, employees, counsel, assigns or successors. To the extent any such Existing Claims exist, they are fully, forever, and irrevocably waived and released by the Debtor and Aleritas as more fully provided for in Section 4 of this Agreement.

## 2. LENDER'S ACCEPTANCE OF SURRENDERED COLLATERAL IN PARTIAL SATISFACTION OF INDEBTEDNESS.

2.1     Pursuant to Section 9-620 of the New York Uniform Commercial Code, this document shall constitute notice by the Agent and the Lender and receipt and consent by each of the Debtor and Aleritas of the Agent's proposal to retain the Surrendered Collateral in <u>partial</u> satisfaction of the Indebtedness. This Agreement shall also constitute the Debtor's and Aleritas's post-default waiver and renunciation of all of their rights under Article 9, subdivision 6, of the New York Uniform Commercial Code (including, without limitation, Section 9-620).

2

2.2     The Agent agrees to accept the Surrendered Collateral in <u>partial</u> satisfaction of the obligations constituting the Indebtedness of the Debtor to the Agent and the Lender under the Credit Agreement, and the amount of such obligations satisfied by the acceptance by the Agent of the Surrendered Collateral shall be equal to an aggregate amount of $22,000,000.00 representing: (x) $920,834.00 of accrued and owing Facility Fees, (y) $20,801,391.00 of outstanding principal balance of Advances (the "*Satisfied Principal Advances Amount*"), and (z) $277,775.00 of interest accrued to the date hereof in respect of the aggregate outstanding principal of all Advances (including, without limitation, the Satisfied Principal Advances Amount) (such amounts referred to in clauses (x), (y) and (z), collectively, the "*Satisfied Loan Indebtedness*"). Each of the Debtor and Aleritas acknowledges and agrees that, after giving effect to such <u>partial</u> satisfaction, the following obligations of the Debtor shall remain outstanding and in full force and effect under the Credit Agreement until paid in full (collectively, the "*Remaining Debtor Obligations*"): (i) $12,251,032.35 of outstanding principal amount of Advances, plus all interest accruing thereon on and after the date hereof as provided in the Credit Agreement, (ii) all obligations of the Debtor to reimburse the Agent and the Lender for all of Agent's and the Lender's costs, fees and expenses (including attorneys' fees and expenses) incurred in enforcing their rights under the Credit Agreement and Related Documents and (iii) the obligations of the Debtor to pay all other Indemnified Amounts, in each case, whether incurred or arising before, on or after the date of this Agreement.

2.3     Each of the Debtor and Aleritas acknowledges that the credit being received for the Surrendered Collateral is fair and reasonable.

2.4     Each of the Debtor and Aleritas shall assemble and make available to Agent for its immediate possession the Surrendered Collateral and all items relating thereto in possession of the Debtor or Aleritas, as the case may be, including, but not limited to, computer disks, records as to the Surrendered Collateral, contracts, books and records and other information that may reasonably be deemed of assistance to Agent in its management and liquidation of the Surrendered Collateral.

## 3.     THE SPECIFIED INELIGIBLE REPURCHASE AMOUNT; CERTAIN ADDITIONAL ACKNOWLEDGEMENTS BY ALERITAS

3.1     The Agent and the Lender agree to reduce the Specified Ineligible Repurchase Amount from $24,600,000 to $20,000,000 effective as of the date hereof. Aleritas hereby affirms and ratifies its obligations under the Credit Agreement and the other Related Documents in respect of the Specified Ineligible Repurchase Amount in the amount of $20,000,000.

3.2     Aleritas acknowledges and agrees that all obligations and liabilities Aleritas has under the Credit Agreement or any of the other Related Documents (including, without limitation, all indemnities) remain in full force and effect and shall not be satisfied in any way by the acceptance of the Surrendered Collateral by the Agent in partial satisfaction of the Debtor's obligations as provided in this Agreement.

NY1 6761784v.11

## 4. RELEASE OF CLAIMS.

4.1     Each of the Debtor and Aleritas, on behalf of each of their respective successors, assigns, heirs and estates, hereby forever and irrevocably release the Agent and the Lender and their respective affiliates, members, managers, representatives, agents, attorneys, employees, predecessors, successors and assigns from any and all claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whenever or howsoever arising, including, but not limited to, the Existing Claims (collectively, the "*Released Claims*"), whether such Released Claims are known or unknown, contingent or absolute, existing as of the date of this Agreement. The Released Claims include, without limitation, all claims:

4.1.1     that the Agent or the Lender breached its obligations under the Credit Agreement; and

4.1.2     of tort or wrongful conduct, including, but not limited to, any claim by the Debtor or Aleritas for trade libel and/or any claim of fraudulent representation or concealment, or claim of misappropriation against the Agent or the Lender or their respective affiliates, members, representatives, agents, attorneys, employees, predecessors, successors and assigns.

## 5. BANKRUPTCY MATTERS.

5.1     THE DEBTOR AND ALERITAS EACH ACKNOWLEDGE THAT:

5.1.1     IF THE DEBTOR OR ALERITAS, OR ANY OF THEM, FAIL TO PERFORM THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT OR THE CREDIT AGREEMENT OR ANY RELATED DOCUMENT AND FILE, OR HAVE FILED AGAINST THEM, A CASE UNDER THE BANKRUPTCY CODE, SUCH A FILING COULD DELAY THE LENDER'S DISPOSITION OF THE SURRENDERED COLLATERAL. IN THAT EVENT, THE AGENT AND THE LENDER HAVE GOOD CAUSE FOR OBTAINING RELIEF FROM THE AUTOMATIC STAY IMPOSED BY SECTION 362 OF TITLE 11 OF THE BANKRUPTCY CODE OR ANY SIMILAR PROVISION OF LAW INCLUDING ANY RIGHT TO SEEK RELIEF UNDER SECTION 105 OF THE BANKRUPTCY CODE;

5.1.2     THE SURRENDERED COLLATERAL IS NOT NECESSARY TO AN EFFECTIVE REORGANIZATION OF THE DEBTOR BECAUSE AN EFFECTIVE REORGANIZATION IS NOT POSSIBLE; AND

5.1.3     THE DEBTOR AND ALERITAS CANNOT PROVIDE "ADEQUATE PROTECTION" (AS DEFINED IN SECTION 362(D)(1) OF THE CODE) OF AGENT'S SECURITY INTEREST IN THE SURRENDERED COLLATERAL.

5.2     THE DEBTOR AND ALERITAS MAKE THE FOREGOING ACKNOWLEDGMENTS WITH THE UNDERSTANDING AND DESIRE THAT THEY BE TREATED AS ADMISSIONS IN CONNECTION WITH ANY PROCEEDING FOR RELIEF FROM THE AUTOMATIC STAY OR ANY SIMILAR PROVISION OF LAW WHEREIN THE AGENT IS SEEKING LEAVE TO FORECLOSE OR EXERCISE ANY REMEDY

4

AGAINST THE SURRENDERED COLLATERAL IN ANY SUBSEQUENT BANKRUPTCY PROCEEDING THAT INVOLVES THE DEBTOR.

5.3 BASED ON THE FOREGOING FACTUAL BACKGROUND, THE DEBTOR AND ALERITAS AGREE THAT, IN THE EVENT THAT ANY ONE OR MORE OF THEM SHALL (I) FILE OR SEEK IN ANY FUTURE CHAPTER 11 CASE (OR ANY OTHER CASE FILED UNDER THE BANKRUPTCY CODE BY OR AGAINST EITHER THE DEBTOR) ANY RELIEF TO MODIFY OR LIMIT THE AGENT'S OR THE LENDER'S RIGHTS HEREUNDER IN ANY BANKRUPTCY COURT OF COMPETENT JURISDICTION OR, (ii) HAVE SOUGHT OR CONSENTED TO OR ACQUIESCED IN THE APPOINTMENT OF ANY TRUSTEE, RECEIVER, CONSERVATOR OR LIQUIDATOR, (iii) BE THE SUBJECT OF ANY ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF COMPETENT JURISDICTION APPROVING A PETITION FILED BY OR AGAINST SUCH PARTY FOR ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE LAW RELATING TO BANKRUPTCY, INSOLVENCY OR RELIEF FOR THE DEBTOR, THEN THE AGENT SHALL THEREUPON BE ENTITLED TO RELIEF FROM:

5.3.1 ANY AUTOMATIC STAY IMPOSED BY SECTION 362 OF TITLE 11 OF THE BANKRUPTCY CODE, AS AMENDED, ON OR AGAINST THE RIGHTS AND REMEDIES OTHERWISE AVAILABLE TO AGENT OR THE LENDER AS PROVIDED IN THIS AGREEMENT OR IN THE CREDIT AGREEMENT, OR

5.3.2 ANY OTHER SIMILAR PROVISION OF LAW WHICH RESULTS IN A DELAY OR A PROHIBITION OF THE AGENT'S OR THE LENDER'S RIGHT TO EXERCISE ITS RIGHTS AND REMEDIES UNDER THIS AGREEMENT AND THE CREDIT AGREEMENT.

5.3.3 THE DEBTOR AND ALERITAS HEREBY FURTHER AGREE:

(i) TO TAKE AND/OR CONSENT TO ANY AND ALL ACTION NECESSARY TO EFFECTUATE SUCH RELIEF FROM THE AUTOMATIC STAY OR OTHER PROVISION OF LAW, AND

(ii) THAT THEY WAIVE THEIR RIGHTS TO SEEK SECTION 105 INJUNCTIONS, ANY OTHER CLAIMS, AND THE FILING OF A SUBSEQUENT PROCEEDING BY EITHER THE DEBTOR OR ALERITAS WITH RESPECT TO ANY ACTS BY THE AGENT OR THE LENDER TO ENFORCE RIGHTS IN THE SURRENDERED COLLATERAL.

5.4 PROVIDED THE DEBTOR OR ALERITAS IS VIGOROUSLY OPPOSING THE RELIEF SOUGHT, THE FOREGOING CONSENT AND WAIVER SHALL NOT APPLY TO AN INVOLUNTARY PETITION FILED AGAINST THE DEBTOR UNTIL AND UNLESS A FINAL ORDER FOR RELIEF IS ENTERED; PROVIDED, HOWEVER, THAT NOTHING SET FORTH HEREIN SHALL PREVENT THE AGENT OR THE LENDER

FROM SEEKING RELIEF FROM THE AUTOMATIC STAY OR ANY OTHER RELIEF IT DESIRES.

6.    **MISCELLANEOUS.**

6.1    Governing Law; Jury Waiver.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK BUT OTHERWISE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

EACH OF THE PARTIES HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

6.2    Consent to Jurisdiction. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY OR, TO THE EXTENT SUCH COURT LACKS JURISDICTION, THE COURTS OF THE STATE OF NEW YORK, AND EACH WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY REGISTERED MAIL, AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U.S. MAILS, POSTAGE PREPAID. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION 6.3 SHALL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT ANY PARTY'S RIGHT TO BRING ANY ACTION OR PROCEEDING IN THE COURTS OF ANY OTHER JURISDICTION.

6.3    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

6.4    Severability; Integration; No Oral Modifications. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such

6

provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than the other Related Documents to which the Agent is a party. Each of the parties understands that in the event of any subsequent litigation, controversy or dispute concerning any terms, conditions or provisions of this Agreement, neither party shall be permitted to offer or introduce any oral evidence concerning any other oral promises or oral promises or oral agreements between the parties relating to the subject matters of this Agreement not included or referred to herein and not reflected by a writing. This Agreement cannot be amended, modified, or supplemented except by a written document signed by all parties hereto.

6.5    Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.


[SIGNATURES FOLLOW ON NEXT PAGE]

NY1 6761784v.11

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BROOKE CREDIT FUNDING, LLC

By _____
Name: Anita Larson
Title: Vice President


ALERITAS CAPITAL CORP.

By _____
Name: Silverman Consulting
Title: Chief Restructuring Officer
By: Stephen Theobald

DZ BANK AG DEUTSCHE
ZENTRAL-GENOSSENSCHAFTSBANK, as
Agent

By _____
Name    **Patrick F. Preece**
Title    Senior Vice President

By _____
Name    Cecil Smart Jr.
Title    Assistant Vice President

AUTOBAHN FUNDING COMPANY LLC, as
Lender

By: DZ BANK AG DEUTSCHE
ZENTRAL-GENOSSENSCHAFTSBANK, its
Attorney-in-Fact

By _____
Name    **Patrick F. Preece**
Title    Senior Vice President

By _____
Name    Cecil Smart Jr.
Title    Assistant Vice President

| Annex I | | | |
|---|---|---|---|

| BROOKE LOAN # | CUSTOMER NAME | Current Principal Balance | Loan Type |
|---|---|---|---|
| 2527 | The Wallace Agency LLC | 258,340.49 | Brooke Franchise |
| 2752 | Michael J. McCranie | 481,232.18 | Brooke Franchise |
| 4571 | Ryan Daniel, LLC | 149,624.33 | Brooke Franchise |
| 5630 | SPIA 2, LLC | 546,800.61 | Brooke Franchise |
| 5666 | Sandra Gardner Insurance Inc. | 121,252.37 | Brooke Franchise |
| 5783 | CSB Incorporated | 208,903.70 | Brooke Franchise |
| 5856 | Thomas Sanchez | 202,394.54 | Brooke Franchise |
| 5896 | H.C. Specialist Enterprises | 202,766.01 | Brooke Franchise |
| 5915 | Michael Sabin | 210,168.28 | Brooke Franchise |
| 5918 | Kevin G. Cook | 147,485.96 | Brooke Franchise |
| 5919 | Jarrod S. Donahue | 120,299.74 | Brooke Franchise |
| 5922 | The Universal Financial Agency | 187,753.13 | Brooke Franchise |
| 5942 | James Nguyen | 169,039.31 | Brooke Franchise |
| 5944 | Mark E. Evans | 203,119.27 | Brooke Franchise |
| 5946 | Derrick Best | 267,114.42 | Brooke Franchise |
| 5951 | Kevin Kaufman | 202,587.41 | Brooke Franchise |
| 5961 | Mario Castillo | 180,987.16 | Brooke Franchise |
| 6001 | O'Rourke Enterprises, LLC | 271,740.53 | Brooke Franchise |
| 6003 | Affordable Insurance Solutions | 338,024.93 | Brooke Franchise |
| 6023 | Brand Agency, LLC | 413,853.97 | Brooke Franchise |
| 6036 | B & J Taylor Agency, LLC | 160,292.75 | Brooke Franchise |
| 6039 | V.D. Hill & Associates, LLC | 333,542.33 | Brooke Franchise |
| 6113 | Dennis Kavanagh | 227,149.35 | Brooke Franchise |
| 6266 | Norman Nyamandi | 196,231.99 | Brooke Franchise |
| 6285 | Dan Madeley | 277,910.77 | Brooke Franchise |
| 6304 | Timothy Hewitt | 327,058.66 | Brooke Franchise |
| 6318 | Lourdes Young | 204,718.08 | Brooke Franchise |
| 6319 | Kristine N. Jones Agency | 226,547.30 | Brooke Franchise |
| 6321 | Vernon L. Dietz III | 184,614.46 | Brooke Franchise |
| 6327 | Cameron C. Chandler | 208,059.35 | Brooke Franchise |
| 6329 | Lionel Sanabria | 200,697.82 | Brooke Franchise |
| 6334 | Phan Pham | 204,718.08 | Brooke Franchise |
| 6335 | Karen O'Connor | 233,910.85 | Brooke Franchise |
| 6336 | Faustino Marks Jr. | 228,447.64 | Brooke Franchise |
| 6338 | Ricardo Gutierrez | 213,489.51 | Brooke Franchise |
| 6339 | Kevin C. Adams | 243,343.21 | Brooke Franchise |
| 6340 | Bryan Smith | 243,899.30 | Brooke Franchise |
| 6341 | R & S Insurance, LLC | 242,878.53 | Brooke Franchise |
| 6358 | Hedman Anglin Agency, Inc | 295,890.32 | Brooke Franchise |
| 6367 | Diane Williams | 243,049.06 | Brooke Franchise |
| 6430 | East Valley Insurance Solution | 218,182.75 | Brooke Franchise |
| 6431 | Andrew Williams Whitaker | 244,083.10 | Brooke Franchise |
| 6434 | David McCauley & Jon Sapp | 229,664.16 | Brooke Franchise |
| 6436 | Timekia Y. Lowe | 222,746.00 | Brooke Franchise |
| 6442 | Phan Pham | 251,333.13 | Brooke Franchise |
| 6443 | Janel Apostol Insurance Agency | 144,886.07 | Brooke Franchise |

| BROOKE LOAN # | CUSTOMER NAME | Current Principal Balance | Loan Type |
|---|---|---|---|
| 6446 | Syed Sanober Hyder | 210,141.11 | Brooke Franchise |
| 6450 | Willie M. Grady | 167,506.67 | Brooke Franchise |
| 6457 | Diona Brand | 244,843.06 | Brooke Franchise |
| 6486 | API Vancouver Insurance, Inc | 346,818.76 | Brooke Franchise |
| 6489 | Stephen Lewis | 206,782.45 | Brooke Franchise |
| 6496 | Cathy Welch & Derek Welch | 156,227.67 | Brooke Franchise |
| 6497 | Brooks Barbee | 268,591.37 | Brooke Franchise |
| 6501 | Marilyn Henderson Agency, LLC | 240,135.63 | Brooke Franchise |
| 6503 | W K Herbert Enterprises, Inc | 209,744.61 | Brooke Franchise |
| 6537 | Monica Cannady | 202,235.66 | Brooke Franchise |
| 6538 | Juan Pereira | 184,958.66 | Brooke Franchise |
| 6541 | Lynne Oakley | 204,037.65 | Brooke Franchise |
| 6545 | Catina S. Hendrix | 228,583.43 | Brooke Franchise |
| 6551 | Glenn Otto & Nathan Myers | 208,350.24 | Brooke Franchise |
| 6552 | Ann Wagstaff | 153,888.72 | Brooke Franchise |
| 6553 | Alexander Tobon | 213,974.61 | Brooke Franchise |
| 6556 | Khashayar Davtalab | 257,560.87 | Brooke Franchise |
| 6557 | Art Gomez | 208,976.69 | Brooke Franchise |
| 6558 | Barbara Bell | 222,021.35 | Brooke Franchise |
| 6561 | Hedman Anglin Agency, Inc | 23,849.55 | Brooke Franchise |
| 6562 | Eagle Security and Guaranty | 171,941.45 | Brooke Franchise |
| 6563 | Brenda Faulkner Mills | 224,209.29 | Brooke Franchise |
| 6581 | Bauer Insurance Agency, Inc | 204,160.40 | Brooke Franchise |
| 6582 | Andrew M. Collup | 1,358,698.60 | Allstate |
| 6583 | Tabitha Hughes Agency, Inc | 537,400.56 | Allstate |
| 6586 | Radoncic Services, LLC | 250,494.33 | Brooke Franchise |
| 6591 | A Plus Insurance Service Inc. | 230,160.80 | Brooke Franchise |
| 6592 | Rodney Stewart | 187,562.78 | Brooke Franchise |
| 6593 | Jerry Lawrence | 274,236.68 | Brooke Franchise |
| 6594 | Anthony James Brown LLC | 217,408.90 | Brooke Franchise |
| 6595 | Andrew T. Wilson, III | 239,620.80 | Brooke Franchise |
| 6603 | Jean-Robert Mesadieu | 227,393.65 | Brooke Franchise |
| 6604 | Leonard Kirby | 204,522.74 | Brooke Franchise |
| 6605 | Thomas W. Potts | 237,597.91 | Allstate |
| 6606 | Robert Barts | 203,501.08 | Brooke Franchise |
| 6607 | Maxine Blake | 250,842.19 | Brooke Franchise |
| 6610 | The Houle Group, Inc | 1,138,335.62 | Brooke Franchise |
| 6615 | Haylow Insurance Group Inc. | 242,764.71 | Brooke Franchise |
| 6617 | John Wesley Voyles | 338,511.51 | Allstate |
| 6618 | Davis Insurance Group, LLC | 280,121.67 | Brooke Franchise |
| 6619 | Lisa D. Nance | 247,661.26 | Brooke Franchise |
| 6621 | Esmeralda Casimiro | 227,009.70 | Brooke Franchise |
| 6630 | JoAnne Casey Garrison LLC | 992,456.10 | Allstate |
| 6631 | Brian K. Merritt | 74,604.15 | Allstate |
| 6632 | Stephen R. Collup | 89,524.98 | Allstate |
| 6639 | H.N. Kazizian Insurance Agency | 513,621.53 | Allstate |
| 6642 | Gregory Lewis | 245,961.88 | Brooke Franchise |
| 6643 | Clayton Prentice Dryden | 433,037.77 | Allstate |
| 6644 | Earnest R. Burke | 203,470.97 | Brooke Franchise |

| BROOKE LOAN # | CUSTOMER NAME | Current Principal Balance | Loan Type |
|---|---|---|---|
| 6650 | Tracy Givens | 158,030.70 | Brooke Franchise |
| 6651 | Cordelia Solis Gaytan | 217,266.91 | Brooke Franchise |
| 6652 | Leavy, Inc | 153,955.44 | Brooke Franchise |
| 6653 | Janice Soto | 271,541.32 | Brooke Franchise |
| 6655 | Walsh Insurance Services, Inc | 217,140.42 | Brooke Franchise |
| 6656 | Orlando Argueta | 263,019.79 | Brooke Franchise |
| 6658 | Richard Raymond Cornejo | 292,850.26 | Brooke Franchise |
| 6659 | Gonzalez Insurance Services | 698,092.99 | Brooke Franchise |
| 6663 | Allisa Sherman LLC | 371,418.85 | Brooke Franchise |
| 6664 | Joann Garcia LLC | 621,042.32 | Brooke Franchise |
| 6665 | H & K Insurance, Inc | 210,363.59 | Brooke Franchise |
| 6666 | Alvita Fambro | 282,265.89 | Brooke Franchise |
| 6667 | William J. Allen | 214,897.67 | Brooke Franchise |
| 6668 | Denise Davis | 208,083.08 | Brooke Franchise |
| 6669 | Cynthia D. Newsome | 186,450.70 | Brooke Franchise |
| 6673 | Lissa M. Palmes | 222,824.10 | Brooke Franchise |
| 6674 | Old Texan Family Corporation, | 203,453.94 | Allstate |
| 6675 | John & Janise Willhite | 236,750.28 | Brooke Franchise |
| 6676 | David C. Lupo | 307,642.33 | Brooke Franchise |
| 6677 | Jesus Pineda | 122,058.30 | Allstate |
| 6678 | Joseph L. Curtis | 877,138.13 | Allstate |
| 6682 | Carlo Cesti | 297,074.30 | Brooke Franchise |
| 6685 | KJ Enterprises, Inc. | 502,955.25 | Brooke Franchise |
| 6686 | Hendrickson Insurance Services | 190,882.29 | Brooke Franchise |
| 6690 | Miguel Prospero | 240,094.99 | Brooke Franchise |
| 6699 | Deborah Jo Gates | 84,360.70 | Brooke Franchise |
| 6700 | Lisa Francisque | 268,137.00 | Brooke Franchise |
| 6701 | Bridgett Jackson | 198,885.72 | Brooke Franchise |
| 6703 | Turney & Son, Inc. | 1,729,051.68 | Brooke Franchise |
| 6712 | Luis M. Zambrana | 277,689.11 | Brooke Franchise |
| 6713 | Joshua D. Engle | 257,718.00 | Brooke Franchise |
| 6715 | Lee Insurance & Financial, LLC | 210,389.98 | Brooke Franchise |
| 6716 | Jolene Deges | 205,928.66 | Brooke Franchise |
| 6719 | Marcale Dumas | 232,947.16 | Brooke Franchise |
| 6726 | Pamela Yvonne Haenelt | 224,268.37 | Brooke Franchise |
| 6730 | Milestone Insurance Group, LLC | 247,819.34 | Brooke Franchise |
| 6731 | RBF Solutions, Inc. | 222,410.58 | Brooke Franchise |
| 6732 | Larry Phillips, Jr | 241,510.82 | Brooke Franchise |
| 6733 | Kenneth O. Gill | 213,727.02 | Brooke Franchise |
| 6735 | Rodney M. Jefferson | 207,433.28 | Brooke Franchise |
| 6738 | C. Long Insurance, LLC | 208,422.04 | Brooke Franchise |
| 6740 | Jeffrey Randall Callens | 644,396.87 | Allstate |
| 6741 | Michael G. Hammer | 200,353.01 | Allstate |
| 6749 | Manhattan Financial Group | 507,411.67 | Brooke Franchise |
| 6756 | Priority Insurance Needs and S | 281,643.75 | Brooke Franchise |
| 6773 | Janie Evette Serrato | 190,151.98 | Brooke Franchise |
| 6779 | Choice Insurance Agency | 1,728,834.65 | Brooke Franchise |
| 6780 | Michael Pigott Agency, Inc. | 515,941.02 | Brooke Franchise |
| 6787 | Adam Peters Agency, Inc. | 199,148.08 | Brooke Franchise |

| BROOKE LOAN # | CUSTOMER NAME | Current Principal Balance | Loan Type |
|---|---|---|---|
| 6796 | Save On Michigan Insurance | 273,668.92 | Brooke Franchise |
| 6801 | Ridaught Insurance Agency | 293,348.77 | Brooke Franchise |
| 6802 | MSV, LLC | 238,809.56 | Brooke Franchise |
| 6803 | All General Lines Insurance | 352,875.86 | Brooke Franchise |
| 6807 | Marion L. Tutt | 217,435.21 | Allstate |
| 6809 | Wamboldt Risk Management, Inc. | 936,588.32 | Allstate |
| 6810 | Cornette Investments, LLC | 443,613.69 | Brooke Franchise |
| 6814 | Shell Denise Brown | 262,166.61 | Brooke Franchise |
| 6817 | Randy K. Zebendon & Cheryl A. | 456,512.32 | Allstate |
| 6823 | RC Insurance Agency LLC | 238,168.40 | Brooke Franchise |
| 6825 | Renate Aldridge | 213,174.93 | Brooke Franchise |
| 6832 | Robert Sandoval Camero | 306,694.18 | Brooke Franchise |
| 6833 | The Stagner Agency, Inc. | 262,637.85 | Allstate |
| 6836 | Christina Lamas | 227,004.34 | Brooke Franchise |
| 6837 | Curtis D. Kiser | 213,381.35 | Brooke Franchise |
| 6838 | Jeffrey Scott Taylor Funeral | 1,275,306.25 | Funeral Home |
| 6840 | Rodney Booker | 196,399.25 | Brooke Franchise |
| 6846 | Hamill & Hamill Ins. Agency | 919,064.12 | Brooke Franchise |
| 6850 | John F. Dietrich Insurance, In | 451,634.73 | Brooke Franchise |
| 6852 | Advantage Pacific Insurance In | 225,561.08 | Brooke Franchise |
| 6854 | Michael Andrew Donabauer | 162,029.25 | Brooke Franchise |
| 6855 | Nick Hammer Agency, Inc. | 733,579.42 | Brooke Franchise |
| 6860 | Mills Insurance Agency, Inc. | 278,455.52 | Allstate |
|  |  | 51,140,879.94 |  |